## OAKES et al. v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. August 2, 1909.)

### No. 2,797.

1. INDIANS (§ 13*)—RIGHT TO SHARE IN TRIBAL PROPERTY.

Originally the test of the right of individual Indians to share in tribal lands and other tribal property was existing membership in the tribe; but this rule has been so broadened by Act March 3, 1875, c. 131, § 15, 18 Stat. 420 (U. S. Comp. St. 1901, p. 1419), and Act Feb. 8, 1887, c. 119, § 6, 24 Stat. 390, and other acts, as to place individual Indians who have abandoned tribal relations, once existing, and have adopted the customs, habits, and manners of civilized life, upon the same footing in respect of this right as though they had maintained their tribal relations.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 13.*]

2. INDIANS (§ 13*)—ACT JANUARY 14, 1889, RELATING TO CHIPPEWAS IN MINNESOTA—INTERPRETATION.

Act Jan. 14, 1889, c. 24, 25 Stat. 642, relating to the cession of part of the Chippewa reservations in Minnesota and to the allotment in severalty of the remainder, does not expressly or by necessary implication displace the saving provisions of the acts of 1875 and 1887, above named, whereby individual Indians who have abandoned tribal relations, once existing, and have adopted the customs, habits, and manners of civilized life, are accorded the same right to share in tribal property as though they had maintained their tribal relations; nor does it render those provisions less applicable to the Chippewas in Minnesota than to other Indians.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 13.*]

3. INDIANS (§ 13*)—ACT JUNE 7, 1897, RELATING TO RIGHTS OF CHILDREN OF MIXED BLOOD.

Act June 7, 1897, c. 3, 30 Stat. 62, relating to the rights of children of a white man and an Indian woman in tribal property, does not embrace the children of a mother who was living at the time of its passage and was not then recognized by the tribe as one of its members.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 13.*]

4. SUIT TO ENFORCE RIGHT TO ALLOTMENT—PARTIES.

Quære: Whether in a suit against the United States under Act Feb. 6, 1901, c. 217, 31 Stat. 760, to enforce a right to an allotment of specified land, which has been allotted to another Indian, a decree displacing or annulling the existing allotment lawfully can be rendered without making the allottee a party and giving him an opportunity to defend.

(Syllabus by the Court.)

Appeal from the Circuit Court of the United States for the District of Minnesota.

Harvey S. Clapp (C. B. Miller, on the brief), for appellants.

Charles C. Houpt, U. S. Atty.

Before SANBORN and VAN DEVANTER, Circuit Judges, and AMIDON, District Judge.

VAN DEVANTER, Circuit Judge. By their suit commenced and prosecuted under Act Feb. 6, 1901, c. 217, 31 Stat. 760, the appellants asserted that they were entitled to have allotted to them in severalty, under Act Jan. 14, 1889, c. 24, 25 Stat. 642, certain specified lands in the White Earth Indian reservation in Minnesota, that their

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

applications for such allotments had been unlawfully denied by the officers charged with the allotment of the lands in that reservation, and therefore that they were entitled to a decree recognizing and enforcing their rights to such allotments. Upon the final hearing the Circuit Court, being of opinion that none of the appellants came within the terms of the act of 1889, entered a decree dismissing the bill, and an appeal has brought the case here. The facts established by the proofs are as follows:

The appellants are descendants of Margaret Beaulieu, a full-blood Mississippi Chippewa, who was enrolled and recognized during all her life as a member of that tribe and was living upon the tribal reservation at White Earth at the time of her death in 1877. Jane B. Oakes, one of the appellants, is a daughter of Margaret Beaulieu, was by birth a member of the same tribe, and was enrolled and recognized as such from the time of her birth until 1849. In 1829, while she was attending a mission school, she married a Mr. Oakes, a white man, and they lived at a trading post in the Chippewa country until 1849. In that year they moved to Ft. Ripley on the Mississippi, and the next year to St. Paul, where Mr. Oakes engaged in the banking business until the time of his death in 1879. Jane B. Jones, another of the appellants, is a daughter of Mrs. Oakes, was born in the Chippewa country in 1841, and was enrolled and recognized as a member of the Mississippi Chippewa tribe until 1849, when her parents took her to Ft. Ripley and then to St. Paul. She grew to womanhood in the latter place and has been married twice, each time to a white man. Jane Andrews and Cornelia Van Etten Bent, the remaining appellants, are daughters of Mrs. Jones by her first husband. They were born and reared in St. Paul, never were enrolled or recognized as members of the tribe, and are married to white men. After the Oakes family moved to St. Paul, Mrs. Oakes and Mrs. Jones abandoned their former tribal relations, adopted the customs, habits, and manners of civilized life, and ceased to be recognized as members of the tribe. Sometimes they exchanged visits with members of the tribe; but these visits did not occur often, and were confined to relatives. The appellants were all residents of St. Paul when the act of 1889 was passed, and shortly thereafter they asserted that they were entitled to allotments thereunder. In 1894 the names of Mrs. Oakes and Mrs. Jones were placed upon a supplemental census of White Earth Mississippi Chippewas by the chairman of the commission charged with making a census and allotments under the act of 1889, and the next year their names were dropped from the census; but the circumstances in which these acts were done are not disclosed. In 1905, before applying for allotments of specific lands, Mrs. Oakes and Mrs. Jones removed to and took up their residence upon the White Earth Reservation. Whether or not Mrs. Andrews and Mrs. Bent did likewise may be left undetermined, because, if they did, it would not help them, as will be seen presently.

The White Earth reservation was set apart as a tribal reservation for the use and occupancy of the Mississippi Chippewas under the treaty of March 19, 1867 (16 Stat. 719), and was being allotted in severalty under the act of 1889 when the appellants applied for allot-

ments therein and when this suit was commenced. That act is entitled "An act for the relief and civilization of the Chippewa Indians in the state of Minnesota," and provides for obtaining a cession and relinquishment by "all the different bands or tribes of Chippewa Indians in the state of Minnesota," of all their tribal reservations in that state, excepting so much of the Red Lake reservation and of the White Earth reservation as shall be deemed necessary "to make and fill the allotments required by this and existing acts." It further provides: That the cession and relinquishment shall be deemed sufficient as to each reservation, other than the Red Lake reservation, if made and assented to in writing by a designated portion of "the band or tribe of Indians occupying and belonging to" such reservation, and shall be sufficient as to the Red Lake reservation if made and assented to in like manner by a like portion of "all the Chippewa Indians in Minnesota"; that, for the purpose of determining whether the requisite number of Indians participate in the cession and relinquishment and of making the allotments and payments mentioned in the act, an accurate census of "each tribe or band" shall be made; that as soon as the census shall be taken, and the cession and relinquishment shall be obtained and be approved by the President, "all of said Chippewa Indians in the state of Minnesota, except those on the Red Lake reservation, shall * * * be removed to and take up their residence on the White Earth reservation," and thereupon allotments in severalty shall be made to the Red Lake Indians from the unceded part of the Red Lake reservation and to "all the other of said Indians" from the lands in the unceded part of the White Earth reservation, such allotments to be made "in conformity with" the general allotment act of February 8, 1887 (24 Stat. 388, c. 119); that any of said Indians "residing on" any of said ceded reservations may, in his discretion, take his allotment on such reservation; and that all money accruing from the disposal of the ceded lands, after deducting expenses, shall be placed in the treasury of the United States to the credit of "all the Chippewa Indians in Minnesota" and be used for their benefit or paid out to them in the manner and at the times stated in the act. The cession and relinquishment so provided for were obtained in the manner prescribed and were approved by the President March 4, 1890. House Ex. Doc. No. 247 (1st Sess. 51st Cong.).

Originally, the test of the right of individual Indians to share in tribal lands, like the Chippewa reservations in Minnesota, was existing membership in the tribe, and this was true of all tribal property. The question therefore arises: Is there any provision of law which broadens this original rule in a manner which is helpful to the appellants or any of them? If not, their effort to obtain allotments from tribal lands must fail, because it is a necessary conclusion from the facts before recited that Mrs. Oakes and Mrs. Jones, although once members of the Mississippi Chippewa tribe, long since ceased to be such, and that Mrs. Andrews and Mrs. Bent, although possessing some Mississippi Chippewa blood, never were members of the tribe; and, if there be such a provision of law, it must be found elsewhere than in the act of 1889, for that act does not in itself alter the original rule in a manner which is helpful to any of the appellants, but

contains provisions which, in the absence of some provision of law to the contrary, probably would require that the allotments mentioned therein be confined to tribal Indians.

For many years the treaties and legislation relating to the Indians proceeded largely upon the theory that the welfare of both the Indians and the whites required that the former be kept in tribal communities separated from the latter, and, while that policy prevailed, effect was given to the original rule respecting the right to share in tribal property; but Congress later adopted the policy of encouraging individual Indians to abandon their tribal relations and to adopt the customs, habits, and manners of civilized life, and, as an incident to this change in policy, statutes were enacted declaring that the right to share in tribal property should not be impaired or affected by such a severance of tribal relations, whether occurring theretofore or thereafter. One of the earlier acts upon the subject was that of March 3, 1865 (13 Stat. 562, c. 127, § 4), which gave to certain chiefs, warriors, and heads of families of the Stockbridge Munsee tribe the right to become citizens of the United States, upon their dissolving all tribal relations, adopting the habits of civilized life, becoming self-supporting, and learning to read and speak the English language, and then declared that they should not be deprived thereby of the annuities to which they were or might be entitled. That act and others of its kind marked the beginning of the change and were followed by the act of March 3, 1875 (18 Stat. 420, c. 131, § 15 [U. S. Comp. St. 1901, p. 1419]), which extends the benefits of the homestead law to "any Indian born in the United States, who is the head of a family, or who has arrived at the age of twenty-one years, and who has abandoned, or may hereafter abandon his tribal relations," and then declares that:

"Any such Indian shall be entitled to his distributive share of all annuities, tribal funds, lands and other property, the same as though he had maintained his tribal relations."

And next came Act Feb. 8, 1887, c. 119, 24 Stat. 388, which, in its sixth section, provides:

"And every Indian born within the territorial limits of the United States who has voluntarily taken up, within said limits, his residence separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges and immunities of such citizens, whether said Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States, without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property."

Another cognate provision is found in Act Aug. 9, 1888, c. 818, 25 Stat. 392, which declares that a tribal Indian woman "hereafter" marrying a citizen of the United States shall become thereby a citizen of the United States, with all the rights, privileges, and immunities of such a citizen, without impairing or in any way affecting her right to any tribal property or any interest therein.

These acts disclose a settled and persistent purpose on the part of Congress so to broaden the original rule respecting the right to share in tribal property as to place individual Indians who have abandoned

tribal relations, once existing, and have adopted the customs, habits, and manners of civilized life, upon the same footing, in that regard, as though they had maintained their tribal relations. Not only this, but these acts, omitting that of 1865, are general and continuing in their nature, and therefore are as applicable to the Chippewas in Minnesota as to other Indians, unless the act of 1889 discloses, either expressly or by necessary implication, that Congress intended otherwise. In our opinion that act does not thus disclose such an intention. True, it speaks of the Indians concerned as "bands or tribes," provides that all, save those on the Red Lake reservation, "shall * * * be removed" to the White Earth reservation, and is entitled "An act for the relief and civilization of the Chippewa Indians in the state of Minnesota"; but the inference sought to be drawn therefrom, namely, that only tribal and uncivilized Indians are to have the benefits of the act, is materially weakened when we turn to other provisions, such as those directing that enough lands be withheld from the contemplated cession "to make and fill the allotments required by this and existing acts," and that the allotments be made "in conformity with" the act of February 8, 1887, which expressly recognizes the right of individual Indians, who have abandoned their tribal relations and have adopted the customs, habits, and manners of civilized life, to share in tribal property. An inference of such uncertain strength is not enough to overcome the general aversion to repeals by implication, especially where a settled policy in legislation is involved and no reason for disturbing it is apparent. United States v. Gear, 3 How. 120, 130, 11 L. Ed. 523; Frost v. Wenie, 157 U. S. 46, 58, 15 Sup. Ct. 532, 39 L. Ed. 614; United States v. Healey, 160 U. S. 136, 146, 16 Sup. Ct. 247, 40 L. Ed. 369; United States v. Greathouse, 166 U. S. 601, 605, 17 Sup. Ct. 701, 41 L. Ed. 1130; McChord v. Louisville, etc., Co., 183 U. S. 483, 500, 22 Sup. Ct. 165, 46 L. Ed. 289; Great Northern Ry. Co. v. United States, 84 C. C. A. 93, 109, 155 Fed. 945, 961.

We conclude that Mrs. Oakes and Mrs. Jones, who formerly were members of the tribe, are within the saving provisions of the acts of March 3, 1875, and February 8, 1887, and so are entitled to share in the allotment and distribution of the tribal property, the same as though they had maintained their tribal relations, but that Mrs. Andrews and Mrs. Bent, who never were members of the tribe, cannot derive any benefit from any of the acts mentioned; and we reach this conclusion with greater satisfaction, because it is in accord with rulings of the Secretary of the Interior in cases which are not distinguishable from this. William Banks, 26 Land Dec. Dep. Int. 71; Minnie H. Sparks, 36 Land Dec. Dep. Int. 234.

In support of the claims of Mrs. Andrews and Mrs. Bent, our attention is invited to the still later act of June 7, 1897 (30 Stat. 90, c. 3, § 1), which reads as follows:

"All children born of a marriage heretofore solemnized between a white man and an Indian woman, by blood and not by adoption, where said Indian woman is at this time, or was at the time of her death, recognized by the tribe shall have the same rights and privileges to the property of the tribe to which the mother belongs, or belonged at the time of her death, by

blood, as any other member of the tribe, and no prior act of Congress shall be construed as to debar such child of such right."

But of this act it is enough to say that its terms are such that it does not embrace the children of a mother, such as Mrs. Jones, who was living at the time of its passage and was not then recognized by the tribe as one of its members.

As a defense to the claims of Mrs. Oakes and Mrs. Jones, it is alleged that all of the land selected by the former and a part of that selected by the latter has been "duly allotted" to other Indians; but, as this defense was not passed upon by the Circuit Court, and as the record indicates that the evidence bearing thereon is not as full and clear as it might be, we deem it the better course to leave the matter open to further consideration in the Circuit Court. And it is suggested, without indicating any conclusion thereon, that a question has arisen as to whether a decree displacing or annulling the existing allotments to other Indians lawfully can be rendered, unless the allottees be made parties and be given an opportunity to defend. United States v. Fairbanks (decided by this court June 3, 1909) 171 Fed. 337; Minnesota v. Hitchcock, 185 U. S. 373, 387, 22 Sup. Ct. 650, 46 L. Ed. 954.

In the answer it is also alleged that part of the land selected by Mrs. Jones has been specially set apart for allotment to Indians who may be removed from the Mille Lac reservation; but no proof of any such setting apart or of any authority therefor is contained in the record, and no mention thereof is made in the government's brief, so this defense must be regarded as abandoned.

Following what has been said, the decree of the Circuit Court is affirmed in so far as it dismisses the bill as to Mrs. Andrews and Mrs. Bent, and in other respects it is reversed, with directions for further proceedings not inconsistent with the views expressed herein.