UNITED STATES ex rel. BESAW v. WORK, Secretary of the Interior.

(Court of Appeals of the District of Columbia. Submitted April 6, 1925. Decided June 1, 1925.)

No. 4242.

I. Mandamus ⬤⇒73(I)—Duty of Secretary of the Interior to make distribution to Indians held ministerial, such as could be enforced by judicial process.

Duty of Secretary of the Interior to make distribution to Menominee Indians of money arising from sales of timber cut on reservation pursuant to Act June 12, 1890, Act March 28, 1908, § 4, as amended by Act May 18, 1916, is purely ministerial, and may be enforced by judicial process.

2. Indians ⬤⇒31—Indian held entitled to share in distribution of moneys, notwithstanding he had abandoned tribal life and become citizen.

Under Treaty Oct. 18, 1848, Supplemental Treaty May 12, 1854, Act June 12, 1890, and Act March 28, 1908, § 4, 35 Stat. 51, amended by Act May 18, 1916, providing for cutting of timber on Indian reservation and distribution by Secretary of the Interior of interest on proceeds of timber sold, held, a mixed-blood Indian, whose mother at time of death was recognized member of tribe, was entitled to share in such distribution, notwithstanding such right had been denied at tribal counsel, and notwithstanding claimant under Act March 3, 1875 (Comp. St. § 4611), and Act Feb. 8, 1887, by removing from tribal habitation and adopting habits and customs of civilized land, he became citizen of the United States, particularly in view of Act June 7, 1897, expressly reserving to Indians who so abandon tribal life their rights as members of tribe.

Appeal from Supreme Court of District of Columbia.

Suit by the United States, on the relation of Alexander Besaw, against Hubert Work, Secretary of the Interior. From a decree of

dismissal, plaintiff appeals. Reversed and remanded.

Dennison Wheelock, of Washington, D. C., and Eben R. Minahan, of Green Bay, Wis., for appellant.

C. E. Wright, of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

VAN ORSDEL, Associate Justice. This appeal is from a judgment of the Supreme Court of the District of Columbia, dismissing appellant's petition for a writ of mandamus to require the Secretary of the Interior to pay to relator his per capita interest in certain funds belonging to and being distributed to the Menominee Indians in the state of Wisconsin.

Relator, Besaw, admitted to be a Menominee Indian of mixed blood, was born May 1, 1842, among the Menominee Indians at Fox river, in what is now the state of Wisconsin. His father was a white man. His mother was a Menominee Indian woman of mixed blood, and a recognized member of the tribe. His parents were married prior to 1842.

By Treaty of October 18, 1848, 9 Stat. 952, the Menominee Indians ceded to the United States all their lands in Wisconsin, and agreed to remove to lands west of the Mississippi river, in what is now the state of Minnesota. The treaty, among other things, provided for certain payments in cash to be made to the Indians by the United States, among others, $40,000 to the mixed bloods, and $200,000 in annuities to the tribe. Appellant and his mother were among the persons of mixed blood, designated to participate in the distribution, and accordingly were paid their proportionate shares of the $40,000 fund.

The Indians objected to being removed to the new reservation west of the Mississippi river, and thereafter, under a supplementary treaty of May 12, 1854, 10 Stat. 1065, the present reservation in the state of Wisconsin was ceded to the Indians, who still occupy it in common, unallotted, under the supervision of an Indian agent or superintendent.

Augustine Besaw, father of relator, did not remove to the new reservation, and relator and his mother continued to reside with him on his farm, separate and apart from the tribe, and adopted the habits of civilized life. Appellant never has taken up his residence on the reservation, and accordingly, under the Act of February 8, 1887, 24 Stats.

388 (Comp. St. § 4195 et seq.), became a citizen of the United States. His mother died April 13, 1884.

Under the Act of Congress of June 12, 1890, 26 Stat. 146, timber was cut on the Menominee reservation under the direction of the Secretary of the Interior and sold, the proceeds of which were turned into the Treasury of the United States. The Secretary was authorized to spend one-fifth of this fund for the benefit of the Indians, and the interest accruing on the residue could be paid to them per capita, or expended for their benefit under the direction of the Secretary. The Secretary, on March 5, 1905, directed a per capita distribution of the interest accruing on these funds.

Prior to the making of any per capita distribution, and apparently in anticipation thereof, a council of the Indians was held on the reservation April 9, 1904, at which it was declared that the Menominee Indians of mixed blood, who had participated in the payment of the $40,000 in 1849, had accepted the same with a full and distinct understanding that its acceptance barred them and their descendants from further participation in Menominee funds, property, or rights. This declaration of the council, accompanied by the affidavit of three so-called headmen to the effect that it was understood, at the time of the "half-breed payment" in 1849, that the payment barred the recipients and their descendants from all tribal rights, was forwarded to the Commissioner of Indian Affairs. The Secretary accordingly adopted this declaration, and ruled, in making up the roll for the purpose of per capita distribution, that "no payment should be made to any person who participated in the payment of the sum of $40,000 to half-breeds of the Menominee Tribe in 1849 at Ft. Howard, Wis., nor to their descendants."

The case was submitted to the court below on an agreed statement of facts, in which it is conceded that Besaw is a Menominee Indian in Wisconsin, and that the Secretary of the Interior determined to distribute the funds in per capita payments. These payments have been made annually for some years past, but relator's right to participate therein is denied. This, we think, disposes of the discretionary power vested in the Secretary by Congress. The administrative act imposed upon him, of distributing to those Menominee Indians entitled to participate in the distribution, is a matter of law for the court to determine.

[1] Congress has designated the beneficiaries, leaving to the Secretary merely the

identification of the persons who are Menominee Indians in Wisconsin, and the determination of the time and manner in which the distribution shall be made. In carrying out this duty the Secretary has designated relator as a Menominee Indian, and has set in motion the distribution of the proceeds, rejecting, however, relator's claim to participate in the distribution. The duty here imposed upon the Secretary is purely a ministerial one, for the benefit of private persons, and is therefore enforceable by judicial process. Butterworth v. Hoe, 112 U. S. 50, 5 S. Ct. 25, 28 L. Ed. 656.

The court below seems to have turned the case on the theory that, inasmuch as the money to be distributed is derived from the proceeds of timber cut and sold on the reservation, only those Indians residing on the reservation are entitled to participation in the distribution of the fund. This conclusion the court seems to have deduced from the provisions of the act of 1908 (35 Stat. 51), which provides for the erection of buildings, mills, etc., for carrying on the timber operations, and that the Secretary "in so far as practicable shall at all times employ none but Indians upon said reservation in forest protection," and further that, "whenever any Indian or Indians shall enter into any contract pursuant to this act, and shall seek by any agency, copartnership agreement, or otherwise to share in the same with any white man, or shall employ in its execution any labor or assistance other than the labor and assistance of Indians, such act or acts shall thereupon terminate such contract, and the same shall be annulled and canceled." The act then provides for the sale of the timber and the depositing of the proceeds in the Treasury to the credit of the "tribe entitled to the same."

Section 4 of the act provides "that the Secretary of the Interior is hereby authorized to pay, out of the funds of the tribe of Indians located upon said reservation, the necessary expenses of the lumber operations herein provided for, including the erection of sawmills, equipment and necessary buildings, logging camps, logging equipment, the building of roads, improvement of streams, and all other necessary expenses, including those for the protection, preservation, and harvest of the forest upon such reservation."

[2] We think that the construction placed on this act by the court below cannot be sustained. The act merely directed the manner in which the lumber operations should be conducted on the reservation, giving the Indians the preference right to furnish the labor and consequently get the benefit thereof in the matter of harvesting the timber, and where the act provides that the expenses shall be paid out of the funds "of the tribe of Indians located upon said reservation" it is merely descriptive of the tribe in general, since the act, as amended May 18, 1916 (39 Stat. 157), provides that "the net proceeds of the sale of all forest products shall be deposited in the Treasury of the United States to the credit of the Menominee Tribe of Indians."

The question, then, presented for our determination, is whether or not, under the various acts of Congress defining the rights of Indians in general, relator is still a member of the Menominee Tribe of Indians in Wisconsin. It is stipulated in the agreed statement of facts "that relator's mother died April 13, 1884, and there is no evidence, other than herein appearing, showing that she was then recognized by the tribe, or had been recognized since 1849; that there is no evidence that either relator or his mother ever expressed any intent to abandon the Menominee Tribe of Indians, or to relinquish or surrender any right to membership, tribal properties, funds, benefits, or privileges; and there is no evidence of their having abandoned the tribe, or such tribal rights, other than (a) their remaining with Augustine Besaw and failing to remove to the reservation as aforesaid, thereafter living apart from the tribe; (b) relator's adoption of the habits of civilized life; and (c) their participation in said 'half-breed payment' if the same was in release of all rights and claims to tribal properties. There is no evidence, other than as herein related, that the Menominee Tribe of Indians ever declined to recognize relator or his mother as members of the tribe; and there is no evidence that the Menominee Tribe of Indians ever, between 1849 and April 9, 1904, considered or acted upon any question concerning the rights of relator and his mother, or either of them, to tribal benefits or membership."

It will be observed that there is nothing before us to indicate that Besaw, who was a recognized member of the tribe in 1849, ever abandoned his tribal rights or was denied recognition of those rights, except as appears from the resolution of the council in 1904, to the effect that all mixed-blood Menominee Indians, who participated in the distribution in 1849, were barred from further participation in tribal property. This action by the council of the tribe in 1904 amounts to nothing more than a declaration of interest on their part, as against the in-

terest of mixed-blood Menominee Indians. It cannot be given the authority of law, nor is it even evidential of any agreement entered into at the time of the distribution in 1849. If any such understanding was had, it was not authorized by the treaty, nor by any authority having legal sanction.

In view of the subsequent acts of Congress, nothing was done by the relator, or by his mother, tending to sever their relations with the tribe, which could operate to their detriment. The Act of Congress of March 3, 1875, 18 Stat. 420, provides for Indians who had abandoned, or who should hereafter abandon, their tribal relations to settle a homestead under the homestead laws, with the express provision "that any such Indian shall be entitled to his distributive share of all the annuities, tribal funds, lands, and other property, the same as though he had maintained his tribal relations; and any transfer, alienation, or incumbrance of any interest he may hold or claim by reason of his former tribal relations shall be void." Comp. St. § 4611.

The Act of February 8, 1887, 24 Stat. 390, provides, among other things, that "every Indian born within the territorial limits of the United States who has voluntarily taken up, within said limits, his residence separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens, whether said Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property."

These acts were the declaration of a policy on the part of Congress to induce Indians to break away from their tribal relations and tribal customs and establish themselves in conformity with the habits of civilized life. Thereafter Congress by the Act of June 7, 1897, 30 Stat. 62, 90, provided: "That all children born of a marriage heretofore solemnized between a white man and an Indian woman by blood and not by adoption, where said Indian woman is at this time, or was at the time of her death, recognized by the tribe shall have the same rights and privileges to the property of the tribe to which the mother belongs, or belonged at the time of her death, by blood, as any other member of the tribe, and no prior act of Congress shall be construed as to debar such child of such right."

As we have observed, by the agreed statement of facts, relator Besaw and his mother were recognized members of the Menominee Tribe in 1849, and nothing was done either by them or by the tribe to disturb that recognition prior to the death of the mother, or as to relator prior to the act of 1897. Relator, therefore, comes within the provisions of the act of 1897, which affirms his right, as a member of the Menominee Indian Tribe in Wisconsin, regardless of any prior act of Congress, or of any subsequent resolution that may have been passed at a tribal council of the Indians, to participate in the tribal property.

The Circuit Court of Appeals of the Eighth Judicial Circuit had under consideration the interpretation of the acts of Congress here in question in the case of Oakes v. United States, 172 F. 305, 97 C. C. A. 139. That suit was brought by Mrs. Oakes, her daughter, and two granddaughters, to establish their right to have allotted to them in severalty certain specified lands in the White Earth Indian Reservation in Minnesota under the Act of January 14, 1889, 25 Stat. 642. It appeared that Mrs. Oakes and her daughter, Mrs. Jones, had abandoned their former tribal relations and adopted the habits of civilized life long prior to the enactment of the act of 1889. It further appeared that they had become citizens of the United States under the act of 1887. Their claims to allotment were opposed on the ground that Congress intended to grant allotments by the act of 1889 only to tribal reservation Indians —a similar contention to that here made.

It was contended that this intention was disclosed by the title to the act, "for the relief and civilization of the Chippewa Indians in the state of Minnesota," and by reference to the Indians in portions of the act as "bands or tribes." It was under this act for the relief of the Chippewa Indians that Mrs. Oakes, her daughter, and granddaughters were claiming. The act provided for the cession by the Indians of all their lands in Minnesota, outside of the White Earth and Red Lake Reservations, and so much of those as were not required for the allotments. The act further provides that "all of said Chippewa Indians in the state of Minnesota, except those on the Red Lake Reservation shall, under the direction of said Commissioner, be removed to and take up their residence on the White Earth Reservation." It would seem that the act strongly indicated that Congress was dealing only with Indians occupying the lands which were to be ceded, and who would of necessity be removed.

The court, however, in an opinion by Judge Van Devanter, held that these provisions did not indicate an intention on the part of Congress that the allotments were to be limited to tribal reservation Indians. On this point the court said: "For many years the treaties and legislation relating to the Indians proceeded largely upon the theory that the welfare of both the Indians and the Whites required that the former be kept in tribal communities separated from the latter, and, while that policy prevailed, effect was given to the original rule respecting the right to share in tribal property; but Congress later adopted the policy of encouraging individual Indians to abandon their tribal relations and to adopt the customs, habits, and manners of civilized life, and, as an incident to this change in policy, statutes were enacted declaring that the right to share in tribal property should not be impaired or affected by such a severance of tribal relations, whether occurring theretofore or thereafter."

After citing and quoting from a number of the acts of Congress, the court said: "These acts disclose a settled and persistent purpose on the part of Congress so to broaden the original rule respecting the right to share in tribal property as to place individual Indians who have abandoned tribal relations, once existing, and have adopted the customs, habits, and manners of civilized life, upon the same footing, in that regard, as though they had maintained their tribal relations. Not only this, but these acts, omitting that of 1865, are general and continuing in their nature, and therefore are as applicable to the Chippewas in Minnesota as to other Indians, unless the act of 1889 discloses, either expressly or by necessary implication, that Congress intended otherwise. In our opinion that act does not thus disclose such an intention."

The court, referring to the provisions in the Allotment Act which seemed to evince an intention on the part of Congress to limit the benefits to Indians who resided on the reservation, said: "An inference of such uncertain strength is not enough to overcome the general aversion to repeals by implication, especially where a settled policy in legislation is involved and no reason for disturbing it is apparent. * * * We conclude that Mrs. Oakes and Mrs. Jones, who formerly were members of the tribe, are within the saving provisions of the Acts of March 3, 1875, and February 8, 1887, and so are entitled to share in the allotment and distribution of the tribal property, the same as

though they had maintained their tribal relations."

This case fits the present case exactly. It sweeps aside the contention that the fund accumulated from the sale of timber on the Menominee Reservation should be confined in its distribution to Indians residing on that reservation. It is a part of the property of the Menominee Indians in Wisconsin, and is subject to distribution to all the members of that tribe, of which the relator is one. The opinion in the Oakes Case also disposes conclusively of the effect of any understanding that may have been existing at the time of the distribution of 1849, since it holds that the general policy established by Congress in its later acts is to establish and restore the rights of Indians who have abandoned their tribal life and adopted the customs and habits of civilized life. Hence, in the absence of any act of Congress (if, indeed, that would have been effective) to deprive relator of his rights either by participation in the distribution of 1849 or by subsequent acts, the decision in the Oakes Case is conclusive.

Confusion seems to have arisen through failure to distinguish between membership in an Indian tribe and the mere severance of tribal relations. The breaking or severance of tribal relations occurs where a member of the tribe abandons the tribal life, removes from the tribal habitation, and by marriage, exercise of the homestead right, or otherwise, establishes a residence elsewhere and adopts the habits and customs of civilized life. But membership in an Indian tribe is based upon the firm foundation of right by blood inherited from Indian ancestry.

Nor is the test one of citizenship. In the absence of a treaty or an act of Congress conferring the right, an Indian, regardless of the place of residence or habit of living, could not become a citizen of the United States. But the act of 1887, conferring citizenship upon Indians, who already had, or who would in the future, abandon tribal life and adopt the habits and customs of civilized life, expressly reserved to such Indians all their rights in tribal property held in common for the benefit of the membership of the tribe. Hence the mere transfer of citizenship is not important, so far as the question of the rights in tribal property is concerned.

It follows that relator, Besaw, born of a marriage between a white man and an Indian woman by blood, and who was so recognized by the tribe at the time of her death, is entitled to all the rights and privileges in the

property of the tribe to which his mother belonged as any other member of the tribe, regardless of where or how long he may have maintained his habitation elsewhere than on the reservation or among the Indians. The test is a simple. one: Was his mother at the time of her death a recognized member of the Menominee Indian Tribe in Wisconsin? This is not expressly denied by the agreed statement of facts. Her membership by birth and at the time of her marriage is conceded. It is incumbent, therefore, upon one denying the right of relator to participate in the tribal property, to establish by convincing proof the fact that the mother at the time of her death was not a recognized member of the tribe. This proof the record fails to disclose, leaving relator's case in the eyes of the law complete.

The judgment is reversed, with costs, and the cause is remanded for further proceedings, not inconsistent with this opinion.