## UNITED STATES ex rel. KADRIE et al. v. WEST, Secretary of the Interior.

Court of Appeals of District of Columbia.
Submitted November 7, 1928. Decided
February 4, 1929.

No. 4780.

Webster Ballinger, of Washington, D. C., for appellants.

O. H. Graves and Leo A. Rover, both of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

VAN ORSDEL, Associate Justice. Appellants, plaintiffs below, filed a petition in the Supreme Court of the District of Columbia, for a writ of mandamus to compel the defendant, Secretary of the Interior, to restore the names of the relators to the supplemental rolls of the Chippewa Indians in the state of Minnesota, and to pay them their per capita share in all future money payments that may hereafter be made from the funds now in the Treasury of the United States belonging to said Indians. From a judgment in favor of the defendant, this appeal was taken.

By the Act of Congress of January 14, 1889, 25 Stat. 642, the United States submitted a proposal to all the different bands or tribes of Chippewa Indians in the state of Minnesota, with the view of locating them upon the White Earth and Red Lake Reservations. The act provided, among other things, for a commission to negotiate with the Indians, scattered in different bands throughout the state of Minnesota, for the relinquishment and cession of their lands, in lieu of rights to be accorded them under the act, in the Red Lake and White Earth Reservations.

It appears that the relators are the minor children of Sarah Kadrie, who was the daughter of Mary Blair, a member of the White Earth band of Chippewa Indians in Minnesota, and who was duly enrolled as such in the census roll made by the Commissioners under the act of 1889, and as such was entitled to and participated in the allotment of lands under said act. In 1892 there was born to Mary Blair, in lawful wedlock, Sarah Cogger, mother of relators, who was enrolled on the supplemental rolls, and who has at all times received her per capita share of all money payments made under the 1889 act. In 1909 Sarah Cogger, while attending an Indian school, was married to one Mall Kadrie, a naturalized citizen of the United States, and the relators are the children of this marriage. Following the respective births of the relators, Mary I. Kadrie, Evelina Kadrie, and Amit K. Kadrie, their names were entered upon the rolls by the proper officers of the United States, pursuant to the practice then in force of enrolling the lineal issue of the original enrolled and allotted ancestor.

The act of 1889 provides: "That in any case where an allotment in severalty has heretofore been made to any Indian of land upon any of said reservations, he shall not be deprived thereof or disturbed therein except by his own individual consent separately and previously given, in such form and manner as may be prescribed by the Secretary of the Interior." Section 1.

Section 3 of the act provides: "That as soon as the census has been taken, and the cession and relinquishment has been obtained, approved, and ratified, as specified in section one of this act, all of said Chippewa Indians in the state of Minnesota, except those on the Red Lake Reservation, shall, under the direction of said Commissioners, be removed to and take up their residence on the White Earth Reservation, and thereupon there shall, as soon as practicable, under the direction of said Commissioners, be allotted lands in severalty to the Red Lake Indians on Red Lake Reservation, and to all the other of said Indians on White Earth Reservation, in conformity with the Act of February eighth, eighteen hundred and eighty-seven, entitled 'An act for the allotment of lands in severalty to Indians on the various reservations, and to extend the protection of the laws of the United States and the territories over the Indians, and for other purposes'; and all allotments heretofore made to any of said Indians on the White Earth Reservation are hereby ratified and confirmed with the like tenure and condition prescribed for all allotments under this act."

The act then provides that Indians who desire may take allotments on the reservation where they lived at the time of the removal, instead of being removed and taking an allotment on the White Earth Reservation. This privilege accorded the Indians of taking allotments on the reservation where they lived, as well as the right accorded those already having allotments to retain the same, is in accord with the general policy theretofore adopted by the government of inducing the Indians to abandon their tribal relations and adopt the customs of civilized life. We are, however, only indirectly concerned in this case with the matter of allotments, since the relief here sought is against certain funds standing to the credit of the Chippewa Indians in the Treasury

of the United States, derived from the sale of lands belonging to the Indians in excess of the allotments made under the act.

Section 7 of the act in part provides as follows: "That all money accruing from the disposal of said lands in conformity with the provisions of this act shall, after deducting all the expenses of making the census, of obtaining the cession and relinquishment, of making the removal and allotments, and of completing the surveys and appraisals, in this act provided, be placed in the Treasury of the United States to the credit of all the Chippewa Indians in the state of Minnesota as a permanent fund, which shall draw interest at the rate of five per centum per annum, payable annually for the period of fifty years, after the allotments provided for in this act have been made, and which interest and permanent fund shall be expended for the benefit of said Indians in manner following: One-half of said interest shall, during the said period of fifty years, except in the cases hereinafter otherwise provided, be annually paid in cash in equal shares to the heads of families and guardians of orphan minors for their use; * * * and at the expiration of the said fifty years, the said permanent fund shall be divided and paid to all of said Chippewa Indians and their issue then living, in cash, in equal shares."

In accordance with a recommendation made by the Indian agent at the White Earth Reservation in 1916, the names of these relators were stricken from the rolls. Thereafter the mother, Sarah Kadrie, petitioned the Secretary of the Interior for a revocation of the order striking relators' names from the rolls. The matter was referred to the Solicitor of the Department of the Interior for an opinion determinative of their rights. The Solicitor in his opinion, in passing upon the rights of relators, said:

"In the particular case giving rise to a call for this opinion, Sarah Kadrie, née Cogger, was a full-blood Chippewa Indian woman born on the reservation in the year 1892, subsequent to the cession and the original enrollment. She was an only child of her mother, a member of the original enrollment. As such, she is entitled to participate for herself in the annuities, and that right is accorded to her. She married, in 1909, Mall Kadrie, a native of Syria, and since then has resided with him mainly in Canada, but for a short time in Syria, and at no time on the reservation, although occasionally visiting it. There have been born of said marriage four children, the oldest now about nine years of age. Her three oldest children were for some years enrolled among the Chippewa Indians, and she was paid annuities for them, until the year 1917, when, by direction of the Indian Bureau, their names were stricken from the roll and their annuities withheld. At the same time, the enrollment of the youngest child was refused. In my opinion, this action was erroneous, and should be corrected. Sarah Kadrie and her children are 'issue' of her mother, a full-blood Chippewa Indian duly enrolled, and as such they will be entitled, at the expiration of the trust period, to share in the distribution of the trust fund, and meanwhile they are equally entitled to share in the annuities arising from that fund. Those rights they have not forfeited, either by acquiring foreign citizenship, or failing to acquire residence on the Indian reservation or with the tribe."

In conformity with this opinion, the children of Sarah Kadrie, then living, were restored to the rolls, and thereafter, in accordance with the prevailing practice, the names of the relators, Bertha, Mailivan E., Marie, Dorothy, Elmer, and Omer Kadrie, were, following their respective births, duly placed upon the supplemental rolls and received their per capita share of the interest payment from the trust fund, standing in the Treasury, until 1927, when the present Solicitor of the Department of the Interior rendered an opinion in the case of one Jane B. Andrews, an applicant for enrollment, in which he expressly overruled the opinion of the former Solicitor, holding in effect that the lineal issue of Chippewa Indians in Minnesota, whose names appear on the rolls prepared under the authority contained in the act of 1889, were not entitled to enrollment on the supplemental rolls, or entitled to participate in the per capita distribution of the funds, unless they were born to membership in the tribe or band, had lived or affiliated with the tribe or band, and had been recognized by the tribe as members thereof.

We think the Solicitor was in error in overruling the decision of the former Solicitor. The opinion is based chiefly upon the decision in the case of Oakes et al. v. United States (C. C. A.) 172 F. 305. In that case the right to claim allotment under the act of 1889 was involved. It appeared that two of the plaintiffs, by birth members of the tribe, had been taken by their parents in 1849 to Ft. Ripley, and later to St. Paul, where they thereafter resided and

were married to white men. They had not resided on the Indian reservation since 1849, and were residents of St. Paul when the act of 1889 was passed. Shortly thereafter they asserted their right to allotments under the act, and in 1894 their names were placed upon the supplemental census as White Earth Mississippi Chippewa Indians. These appellants were held to be entitled to allotments.

The two remaining plaintiffs, who were daughters of one of the appellants aforesaid, were born in St. Paul, had never been recognized by the Indians, had never lived on the Indian reservation, were never members of the tribe, and had never asserted any rights by virtue of Indian blood until, in this case, they sought allotments. As to those two plaintiffs, the court held that they were not entitled to allotments under the act of 1889.

We think the decision in the Oakes Case is not controlling here. In that case the court was considering rights to allotments under the act of 1889. Of course, the only Indians entitled to allotments were Chippewa Indians then living in the state of Minnesota. The after-born issue of these Indians would have no standing in securing allotments under the act. But section 7 of the act, relating to the placing of the funds in the Treasury and the distribution of the interest arising from the funds, and of the fund itself at the termination of 50 years, treats of a different matter. It looked to and contemplated conditions that might arise in the meantime, not to conditions present at the time the act was passed, and for that reason provision was made for the distribution of this fund "to the Chippewa Indians and their issue, then living, in cash, in equal shares."

We think this provision of the statute must be read in connection with the policy Congress had established at that time in relation to the Indians. The Act of Congress of March 3, 1875, 18 Stat. 420, § 15 (43 USCA § 189) which established the benefits of the homestead law to "any Indian born in the United States, who is the head of a family, or who has arrived at the age of twenty-one years, and who has abandoned, or may hereafter abandon, his tribal relations, * * * shall be entitled to his distributive share of all annuities, tribal funds, lands, and other property, the same as though he had maintained his tribal relations."

And section 6 of the Act of February 8, 1887, 24 Stat. 388, provides: "And every Indian born within the territorial limits of the United States who has voluntarily taken up, within said limits, his residence separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens, whether said Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property."

This liberal policy, extended by Congress for the purpose of breaking up and destroying the Indian tribal relation, and inducing them to adopt the habits of civilized life, is emphasized by the Act of August 9, 1888, 25 Stat. 392 (25 USCA §§ 181–183), which declares that a tribal Indian woman, hereafter marrying a citizen of the United States, shall thereby become a citizen of the United States, with all the rights, privileges and immunities of such a citizen, without in any way impairing or affecting her right to any tribal property or any interest therein.

Sarah Kadrie, the mother, under this act, by her marriage to a naturalized citizen of the United States, became likewise a citizen of the United States, and, availing herself of the inducement offered in the acts of Congress, left the Indian reservation to take up and adopt the habits of civilization. The relator children were born under these circumstances, and should be given, we think, the benefits to be derived from a reasonable interpretation of the statutes.

Mr. Justice Van Devanter, in his opinion in the Oakes Case, referring to the effect of the statutes above cited, said:

"These acts disclose a settled and persistent purpose on the part of Congress so to broaden the original rule respecting the right to share in tribal property as to place individual Indians who have abandoned tribal relations, once existing, and have adopted the customs, habits, and manners of civilized life, upon the same footing, in that regard, as though they had maintained their tribal relations. Not only this, but these acts, omitting that of 1865, are general and continuing in their nature, and therefore are as applicable to the Chippewas in Minnesota as to other Indians, unless the act of 1889 discloses, either expressly or by necessary implication, that Congress intended otherwise. In our opinion that act does not thus

disclose such an intention. True, it speaks of the Indians concerned as 'bands or tribes,' provides that all, save those on the Red Lake Reservation, 'shall * ꞌ ꞌ be removed' to the White Earth Reservation, and is entitled 'An act for the relief and civilization of the Chippewa Indians in the state of Minnesota'; but the inference sought to be drawn therefrom, namely, that only tribal and uncivilized Indians are to have the benefits of the act, is materially weakened when we turn to other provisions, such as those directing that enough lands be withheld from the contemplated cession 'to make and fill the allotments required by this and existing acts,' and that the allotments be made 'in conformity with' the Act of February 8, 1887, which expressly recognizes the right of individual Indians, who have abandoned their tribal relations and have adopted the customs, habits, and manners of civilized life, to share in tribal property. An inference of such uncertain strength is not enough to overcome the general aversion to repeals by implication, especially where a settled policy in legislation is involved and no reason for disturbing it is apparent."

Referring again to the provision of section 7 relative to the disposition of the funds "placed in the Treasury of the United States to the credit of all the Chippewa Indians in the state of Minnesota as a permanent fund," it is apparent that, when the fund was so deposited, this limitation was not carried into the division of the permanent fund, since it is provided that it "shall be divided and paid to all of said Chippewa Indians and their issue then living." This comprehends all the issue, direct and lineal, of the Chippewa Indians living in Minnesota in 1889, wherever living or wherever located. The inducement to sever the tribal relation and establish the habits of civilization, as afforded by the statutes, was accorded by Congress without requiring that residence should be confined to the state of Minnesota. Consequently no limitation in that respect appears in the act. It therefore becomes immaterial whether the children of Sarah Kadrie were born in Canada or in Syria, so long as she retained her citizenship in the United States.

We think a reasonable interpretation of the intent of Congress justifies the extension of the privilege of this act to the lineal descendants of the Chippewa Indians, recognized as such at the time of the passage of the act of 1889, and, owing to the limited period within which distribution is to be made, this does not amount to an unrea-

sonable extension of the privilege. At the end of the 50-year period very few of the Indians living in Minnesota in 1889 will be living to avail themselves of the distribution privileges; and, if the act is confined to their direct "issue," the number available to take would be very limited. It is therefore doubtful, whether the extension of this act to the lineal issue will produce a much greater number to avail themselves of the final distribution than the number that were living in 1889. We think the expression "and their issue then living" includes all of the issue, and therefore should be extended to the relators.

The judgment is reversed, with costs, and the cause is remanded for further proceedings not inconsistent with this opinion.