730 F.2d 1159
 UNITED STATES of America, Appellee,
v.
Wendell OVERLIE, d.b.a. Overlie Trucking, and Darlene
Overlie; Clifford Mossett and Celina Y.B. Mossett; Purley
W. Van Dyke and Geraldine Van Dyke; and Anthony E. Two
Bears and Denise M. Two Bears, Appellants.
 No. 83-1213.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 13, 1983.
Decided March 28, 1984.
 
 Thomas K. Schoppert, New Town, N.D., for Overlie and Two Bears.
 James P. Fitzsimmons, North Dakota Legal Services, New Town, N.D., for Mossett and Van Dyke.
 Raymond Cross, Christopher D. Quale, New Town, N.D., for amicus curiae.
 Carol E. Dinkins, Asst. Atty. Gen., Rodney S. Webb, U.S. Atty., Fargo, N.D., Gary Annear, First Asst. U.S. Atty., Fargo, N.D., Dirk D. Snel, Maria A. Iizuka, Attys., Dept. of Justice, Washington, D.C., for U.S.
 Before BRIGHT, JOHN R. GIBSON and FAGG, Circuit Judges.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 The issue before this court is whether the United States is authorized to withhold and garnish the per capita shares of judgment funds awarded to tribal members by the United States Claims Court and distributed by plans adopted pursuant to the Distribution of Judgment Funds Act, Pub.L. 93-134, 87 Stat. 466 (codified as amended at 25 U.S.C. Secs. 1401-1407 (1976)). The district court held that the government possessed such authority, relying primarily on 25 U.S.C. Sec. 119 (1976) and, to a lesser degree, the policy demonstrated by Fed.R.Civ.P. 64 and 25 C.F.R. Sec. 115.9 (1983). We reverse.
 
 
 2
 In 1981, the United States Claims Court awarded $32,000,000.00 to the Three Affiliated Tribes of the Fort Berthold Reservation. A plan for distributing the award (Plan) was adopted in accordance with the procedural requirements of the Judgment Funds Act. See generally 25 C.F.R. Sec. 87 (1983). The Secretary of the Interior (Secretary) received suggestions from the tribal governing body for distributing the award and a hearing of record on the proposed Plan was held in New Town, North Dakota, the tribal headquarters. 25 U.S.C. Sec. 1403. See 47 Fed.Reg. 30297 (1982). The Plan as approved was submitted to Congress and, as neither House adopted a resolution disapproving it, became effective sixty days later. 25 U.S.C. Sec. 1405.
 
 
 3
 The Plan provided that those members of the tribes owing no tribal debts "shall have their per capita shares paid directly to them." Those members having such debts were to have their shares deposited in their Individual Indian Money (I.I.M.) accounts. I.I.M. accounts, belonging to individual Indians but under the control of the Secretary, are permitted under regulation to be garnished to satisfy "delinquent claims of indebtedness to the United States or any of its agencies or to the tribe of which the individual is a member...." 25 C.F.R. Sec. 115.9. The Plan provided that any amount remaining after satisfaction of the tribal debt was to be paid to the individual Indian.
 
 
 4
 Appellants are enrolled members of the Three Affiliated Tribes. Through 1979, each had judgment entered against them for various amounts as a result of having defaulted on loans obtained from either the Farmers Home Administration or the Small Business Administration. In an effort to satisfy the judgments, the government served garnishee summonses on the Secretary and his representatives, directing them to retain any property belonging to appellants. Each appellant was notified that "a garnishee summons which will require monies which will be deposited in your Individual Indian Money Account to be withheld may be served upon the Secretary of the Interior...." After receiving this notice, appellants inquired as to whether this garnishment jeopardized their per capita payments under the Plan. Officials of the Bureau of Indian Affairs responded that the per capita payments would not be used to satisfy the judgment, stating that "[t]he only provision for debt collection in the approved Plan for Use and Distribution is for Tribal debts." Despite this assurance, appellants' per capita shares were never received. The Secretary intercepted the payments and caused them to be deposited in their I.I.M. accounts, where they remain pending the outcome of this appeal.
 
 
 5
 Appellants filed suit to set aside the garnishment proceedings. They argued that the distribution of judgment funds is exclusively regulated by plans adopted pursuant to the Judgment Funds Act and cited as support language in the Act which provides that "[n]otwithstanding any other law, all use or distribution of [judgment] funds ... shall be made pursuant to the provision of this chapter." 25 U.S.C. Sec. 1401. As the Plan provided that, absent tribal debts, the per capita shares were to be paid directly to them, appellants assert that the Secretary was without authority to place the funds in their I.I.M. accounts. In upholding the garnishment, the district court concluded that the Secretary's action was in violation of the express terms of the Plan. However, it held that the action was authorized under the following statute:
 
 
 6
 Sec. 119. Allotment of tribal funds to individual Indians.
 
 
 7
 The Secretary of the Interior is authorized, in his discretion, from time to time, to designate any individual Indian belonging to any tribe or tribes whom he may deem to be capable of managing his or her affairs, and he may cause to be apportioned and alloted to any such Indian his or her pro rata share of any tribal or trust funds on deposit in the Treasury of the United States to the credit of the tribe or tribes of which said Indian is member, and the amount so apportioned and alloted shall be placed to the credit of such Indian upon the books of the Treasury, and the same shall thereupon be subject to the order of such Indian: Provided, That no apportionment or allotment shall be made to any Indian until such Indian has first made an application therefor: Provided further, That the Secretaries of the Interior and of the Treasury are directed to withhold from such apportionment and allotment a sufficient sum of the said Indian funds as may be necessary or required to pay any existing claims against said Indians that may be pending for settlement by judicial determination in the United States Claims Court or in the Executive Departments of the Government, at time of such apportionment and allotment.
 
 
 8
 25 U.S.C. Sec. 119 (emphasis added). The district court also concluded that the government's authority under section 119 was not preempted by the "[n]otwithstanding any other law" language in the Judgment Funds Act. It reasoned that the legislative history of the Judgment Funds Act revealed that this preemptive language applied only to "prior laws which require that the Congress make special appropriations for each tribal judgment, not to laws which authorize the Secretary to set aside funds for payments of debts held by the United States." This appeal followed.
 
 
 9
 The district court correctly concluded that directing appellants' per capita payments into their I.I.M. accounts was contrary to the provisions of the Plan. We cannot, however, join in its conclusion that, despite this lack of authority, Fed.R.Civ.P. 64, 25 C.F.R. Sec. 115.9, and 25 U.S.C. Sec. 119 together represent a "long-standing policy of allowing the Secretary to set aside funds for payment of debts owed to the United States..." and that it would therefore be "reasonable to assume that if the Congress were to abandon that policy it would do so explicitly."
 
 
 10
 We do not view Fed.R.Civ.P. 64 as representing a policy supporting the Secretary's action. Rule 64 deals only with provisional remedies. See 11 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2931 (1973).
 
 
 11
 Further, 25 C.F.R. Sec. 115.9, which allows for the garnishment of I.I.M. accounts, does not provide support for the Secretary's action. The issue is whether the Secretary has authority to intercept the funds and deposit them in I.I.M. accounts, thereby subjecting them to garnishment. The district court recognized that section 115.9 applies only to funds already deposited in I.I.M. accounts and does not assist in determining whether judgment funds could be initially placed therein. However, it qualified this conclusion by stating that "given the policy of Sec. 115, to collect debts owing to the government, one might broadly interpret it to empower the Secretary to deposit funds in IIM accounts for garnishment." It then proceeded to rest its holding in part on this very interpretation. We reject this expansive reading of section 115.9. The district court properly recognized that the regulation was inapplicable, and we do not believe it enunciates a broad policy to authorize indirectly that which it does not authorize directly.
 
 
 12
 We believe finally that section 119, enacted in 1907, does not give support to the Secretary's action. History reveals that, following the abrogation of its treaty-making authority with regard to the Indian population in 1871, see 25 U.S.C. Sec. 71, the federal government gradually adopted a policy of encouraging the assimilation of Indians into the white man's culture. Cohen, Handbook of Federal Indian Law 127-43 (1982). This policy was carried out by "alloting" to individual Indians sufficient resources to enable them to become independent farmers and ranchers. Cohen describes this policy as one motivated by the desire to replace the "savagery" of tribal autonomy with the "civilized" way of the white man. Id. at 128-29. See Oakes v. United States, 172 F. 305, 308 (8th Cir.1909) (Van Devanter, J.). This policy also had the added benefit of opening up surplus Indian lands for westward expansion and settlement. Cohen at 128-29. First developed with respect to tribal lands, the allotment policy was extended by 25 U.S.C. Sec. 119 to the Indian tribal funds held by the United States government. As stated in the Senate Report accompanying passage of section 119:
 
 
 13
 The policy of alloting Indian lands in severality, so as to break up the old tribal relations, has been going on for years. Ultimately the Indian must become a citizen and work upon the new lines necessarily created by his present environments. He must learn to farm, to raise live stock, and to abandon the aboriginal methods of life. Large areas of Indian lands have already been thus alloted, and many of the tribes have become farmers and stock raisers. But no general attempt has been made to allot the tribal funds in the Treasury.
 
 
 14
 S.Rep. No. 6698, 59th Cong., 2d Sess. 3 (1907).
 
 
 15
 Viewed in this historical light, the mechanics of section 119 envision circumstances far different from those present in this case. First, section 119 deals with "tribal or trust funds on deposit in the Treasury of the United States...." Tribal and trust funds refer to amounts held by the United States government resulting from the sale of surplus tribal lands, 25 U.S.C. Sec. 348, reservation products and mineral and timber revenues, id. at Sec. 155, rentals, royalties, or bonuses from oil and gas leases on Indian lands, id. at Sec. 398b, and fees collected in return for work performed by Indians, id. at Sec. 413. See generally Cohen at 138-39. This indicates a category of funds different from those at issue here--awards to redress past wrongs based on a suit for just compensation under the Fifth Amendment and a suit alleging mismanagement by the United States of tribal resources and coal and grazing lands. Second, section 119 by its terms deals with the apportionment or allotment of tribal or trust funds. As we have shown, these are different in purpose from the individual shares of judgment funds at issue in this case. Third, section 119 provides that allotments are to be given to Indians whom the Secretary "deem[s] to be capable of managing his or her affairs...." In this case, the award did not hinge on appellants' competence. Fourth, section 119 directs that "no apportionment or allotment shall be made to any Indian until such Indian has first made an application therefor." No such application is required with respect to awards distributed under the Judgment Funds Act. Fifth, section 119 directs the Secretaries "to withhold from such apportionment and allotment ...." This case, as we have seen, deals with the Secretary's authority to withhold judgment funds.[3]
 
 
 16
 In light of the above distinctions, we hold that the setoff provision of section 119 does not authorize the government to intercept and deposit in I.I.M. accounts the per capita shares of funds distributed according to the Judgment Funds Act. The two statutes plainly establish two distinct procedures for the distribution of two distinct sources of funds. As such, we must reject the government's characterization of the Judgment Funds Act as simply a general statute which does not preempt, and must give way to, the specific provisions of section 119. We cannot therefore conclude that section 119, 25 C.F.R. 115.9, or Fed.R.Civ.P. 64 represent a policy in support of the Secretary's action.
 
 
 17
 The district court also reasoned that the Secretary's action in diverting the per capita funds indicates he would not have approved the Plan had he considered the issue of setoff for debts owed to the government. The facts simply are that the Secretary submitted the Plan. It made no provision for withholding such funds and was approved by Congress. We believe that the Secretary's concern over withholding the funds could have been more appropriately exercised in the preparation of the Plan before its submission to Congress.
 
 
 18
 The government suggests two other possible sources of authority for the Secretary's actions. First, it cites Joseph F. Hughes & Co. v. United Plumbing & Heating, Inc., 390 F.2d 629 (6th Cir.1968) (per curiam), as support for the proposition that "[t]here is no question that the government is authorized to attempt to collect debts owed to it and that judgment funds are not exempt from garnishment." Appellee's Brief at 11. In Hughes, the government official who held funds belonging to the debtor did so pursuant to an order in aid of execution issued by the district court. 390 F.2d at 629. The very issue under consideration here, however, is whether the Secretary had any authority for his action.
 
 
 19
 As a second source of authority, the government cites three decisions of the Comptroller General authorizing setoffs of payments owing to Indians for debts due the United States. See 34 Op.Comp't Gen. 152 (1954) and decisions cited therein. The Comptroller's decisions are based on statutes providing for the payment of money to Indians from sources other than judgments designed to compensate for past wrongs. See Act of June 17, 1954, 68 Stat. 250 (repealed 1973); Act of February 27, 1925, 43 Stat. 1008 (amending 41 Stat. 1250). As administrative interpretations of unrelated statutes, these decisions are not controlling on the issue before us today.
 
 
 20
 We therefore hold that the Secretary's action in diverting appellants' per capita shares of the judgment funds to their I.I.M. accounts was without authorization.[4] The judgment of the district court is reversed.
 
 
 
 [3]
 Section 119 also provides that a setoff is authorized "to pay any existing claims against said Indians that may be pending for settlement by judicial determination...." This section can thus be read to allow only deductions for tribal debts for which judgment has not been rendered. In this case, the debts were those of individual Indians for which judgment had been rendered. The district court noted this language, and concluded that "it would be absurd to assume that the Congress would authorize a setoff for claims which have not yet even been proved but not allow a setoff for claims that the Government has already established." The legislative history of section 119 is silent on this point. Given the distinctions between section 119 and the Judgment Funds Act enumerated above, a definitive interpretation of this phrase is not required
 
 
 [4]
 Given our disposition, we need not consider whether the letter written by a BIA official assuring appellants that their per capita funds were not subject to the garnishment proceeding created an estoppel against the government