Shirley Lee BORDEAUX, Individually and as Special Administratrix of the Estate of Clara Hudson, No. 3196, Deceased

v.

Mary Ann HUNT, Estate of Lyle T. Hunt; Alvina Woockmann; the United States of America; Honorable James Watt, as United States Secretary of the Interior; Ken Smith, as Assistant Secretary of the Interior for Indian Affairs, Defendants.

Civ. No. 82–3081.

United States District Court, D. South Dakota, C.D.

Nov. 14, 1985.

Ramon A. Roubideaux, Rapid City, S.D., Mario Gonzalez, Pine Ridge, for plaintiffs.

Philip N. Hogen, U.S. Atty., Sioux Falls, S.D., Robert Mandel, Asst. U.S. Atty., Pierre, S.D., Kenneth A. Pels, U.S. Dept. of Justice, Washington, D.C., for U.S. of America, James Watt, and Ken Smith.

William T. Finley, Jr., David F.B. Smith, Kevin W. McLean, Pierson, Semmes & Finley, Washington, D.C., for Named Title Ins. Companies as amici curiae.

DONALD J. PORTER, Chief Judge.

## CASE SUMMARY

This case is one of thirteen filed in this court between December, 1982 and January, 1984, dealing with an identical issue: whether Indian land formerly held in trust for plaintiff's ancestor, but which had been unilaterally taken out of trust by the United States and subsequently alienated by plaintiff's ancestor approximately sixty years ago, should be recovered from its present possessors and returned to trust status for the benefit of the members of plaintiff's family.

The court, having been the recipient of extensive briefing by the parties and by amici, and having considered carefully the contentions of all involved, finds that the removal of the land from trust status, while regrettable, was nonetheless legal. Plaintiff therefore has no valid claim for recovery of the land, and summary judgment must be entered for defendants.

## GENERAL FACTUAL BACKGROUND

The roots of this litigation lie in the General Allotment Act (Dawes Act) of February 8, 1887, Ch. 119, 24 Stat. 388 (codified as amended at 25 U.S.C. §§ 331–334, 339, 341, 342, 348, 349, 354 and 381). This Act provided that individual Indians should receive allotments, with title left in the United States in trust for the allottee for twenty-five years, during which time the allotment could not be sold, mortgaged, or taxed. Section 6 of this Act also provided that upon completion of the "allotments and the patenting of the lands to said allottees," the allottees would become citizens of the United States and subject to the laws of the state or territory in which they resided.

In South Dakota, the individual Indian reservations were created by the Act of March 2, 1889, Ch. 405, 25 Stat. 888. Individual allotments, very similar to those created under the Dawes Act, were authorized under Sections 8 through 11 of the 1889 Act. Section 11 also provided that "each and every allottee under this act shall be entitled to all the rights and privileges and be subject to all the provisions of section six of" the Dawes Act.

The United States Supreme Court, in *Matter of Heff*, 197 U.S. 488, 25 S.Ct. 506, 49 L.Ed. 848 (1905), construed Section 6 of the Dawes Act as conferring citizenship upon Indians upon the initial issuance of an allotment. Under *Heff*, this made the Indians subject to state laws, including those dealing with liquor sales. Congress, in the Burke Act of 1906, Ch. 2348, 34 Stat. 182 (codified at 25 U.S.C. § 349) moved to amend Section 6 of the Dawes Act to defer citizenship until issuance of the fee patent. Congress also enacted, as part of the same Act, the language which is at the heart of the present controversy:

Provided, That the Secretary of the Interior may, in his discretion, and he is hereby authorized, whenever he shall be satisfied that any Indian allottee is competent and capable of managing his or her affairs at any time to cause to be issued to such allottee a patent in fee simple, and thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed....

From 1906 to 1916, the Secretary of the Interior implemented the Burke Act under a policy of granting fee patents to allottees who made application and were deemed competent, generally on the local Indian superintendent's recommendation. In 1916, the application requirement was withdrawn, and the Secretary began the issuance of patents after a government "competency commission" found individual Indians "competent." The requirements were loosened much further on April 17, 1917, with the promulgation of a document entitled "A Declaration of Policy":

To all able-bodied adult Indians of less than one-half Indian blood, there will be given as far as may be under the law full and complete control of all their property. Patents in fee shall be issued to all adult Indians of one-half or more Indian blood who may, after careful investigation, be found competent, provided, that where deemed advisable patents in fee

shall be withheld for not to exceed 40 acres as a home. Indian students, when they are 21 years of age or over, complete the full course of instruction in the government schools, receive diplomas and have demonstrated competency will be so declared.

Office of Indian Affairs, Dept. of the Interior, *Report of the Commissioner of Indian Affairs*, 4 (October 16, 1917).

The presumption of competence was extended further in 1919 to include adult allottees of one-half Indian blood. Large numbers of "forced" fee patents were issued under these policies, involving many thousands of allottees in the western United States. Abuses were rampant: it is clear from the historical evidence cited in plaintiff's brief that many patents were issued to Indians obviously incapable of taking on the burdens of unrestricted property ownership in the midst of a more sophisticated white society. It is clear that some holders of these patents were cheated out of their land by speculators and merchants, and that some land was lost when the Indians sold or mortgaged it for money to pay state property taxes, taxes which could not be legally assessed under the rule of *Choate v. Trapp*, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941 (1912).

The forced fee patent policy was halted in 1921, and Congress eventually moved to provide some relief to the patent holders in the so-called Cancellation Acts of 1927 and 1931, 25 U.S.C. §§ 352a, 352b. These allowed the Secretary of the Interior, in certain circumstances, to return the patented land to trust status, so long as the land was not encumbered or sold. Less than 500 forced fee patents were "cancelled" under these statutes.

## SPECIFIC FACTUAL BACKGROUND

Plaintiff here is claiming under an allotment originally issued to Clara Hudson, a Rosebud Sioux Indian of one-half or less Indian blood. The trust patent was issued to her on April 27, 1909.

In response to the April 17, 1917, "Declaration of Policy," Assistant Commissioner E.B. Meritt provided the Secretary of the Interior, on October 16, 1917, with a list of Rosebud allottees of one-half or less Indian blood, including Clara Hudson, and noted:

As it appears from the record that all of the above named allottees [including Clara Hudson] have less than one-half Indian blood, it is respectfully recommended that the Commissioner of the General Land Office be requested to issue patents in fee to them for the lands set opposite their respective names and that the issuance of these patents be made special.

Assistant Secretary of the Interior S.G. Hopkins endorsed the proposal as follows:

I find from the evidence submitted that the allottees above named [including Clara Hudson] are qualified to care for their own affairs in a degree that entitles them to patents in fee covering the lands described above, and I, therefore, direct the Commissioner of the General Land Office to issue a patent in fee to them for the lands set opposite their respective names, and that the issuance of these patents be made special.

A fee patent was then issued in the name of Clara Hudson on December 29, 1917 for the subject land, although she evidently made no application for its issuance. The fee patent was delivered to her, and she signed a receipt for it on February 13, 1918.

Clara Hudson executed a mortgage covering the subject land on December 5, 1918, to W.H. Tackett. Consideration was listed as $2,500. Clara Hudson then executed a warranty deed on July 8, 1919, covering the same land, to Fritz J. Huddin, acknowledging receipt of $12,500 as consideration. The grantee assumed the outstanding mortgage hereby.

## DISCUSSION

### I.

## APPLICABILITY OF THE BURKE ACT TO SOUTH DAKOTA RESERVATIONS.

■ The argument has been advanced in this litigation that because the allotments

in South Dakota were made under the 1889 Act, rather than the 1887 Dawes Act, the Burke Act, as an amendment to the Dawes Act, never applied to South Dakota. Thus, this argument proceeds, any issuance of a patent in South Dakota under the Burke Act was without authority and accordingly void. This argument is without merit.

Section 6 of the Dawes Act, the precise portion of that Act which was amended by the Burke Act, was incorporated in and made expressly applicable to South Dakota allotments by Section 11 of the 1889 Act.[1] As *Muenich v. United States*, 410 F.Supp. 944, 946 (N.D.Ind.1976) put it:

> It is a basic rule of statutory construction that when one statute incorporates another by reference, an amendment to the incorporated statute operates as an amendment to the statute which incorporated the original act: "[W]hen a statute adopts the *general law* on a given subject, the reference is construed to mean that the law is as it reads thereafter at any given time including amendments subsequent to the time of adoption ..."

*See Sutherland Stat. Const.* § 51.07 (4th Ed.1984). (Emphasis supplied.) The foregoing rule does not apply to "limited and particular provisions", *see Sutherland, supra,* and plaintiff apparently contends that Section 6 of the Dawes Act is such a limited provision. Contrary to plaintiff's position, however, Section 6 of the Dawes Act, in setting forth the law as to the rights of all Indians "born within the territorial limits of the United States" and who had received allotments, was clearly intended by Congress to be the general law on its subject. As such, any later amendments to Section 6, including that made by the Burke Act, also became the general law on allottee rights, and as such, became incor-

porated in the 1889 Act and thus applicable to allotments in South Dakota.[2]

Further, even if it were doubtful whether the Burke Act applied to South Dakota allotments, all doubts would be resolved upon a consideration of the legislative history of the Burke Act. The Burke Act was proposed by, and received its name from, Representative Charles Burke, of South Dakota. The issue now before the court was raised during the debate of the Act:

> Mr. FINLEY. Where are the Indians located who will be affected by this bill?
>
> Mr. BURKE of South Dakota. Mostly in the reservations of the country, if not entirely in the reservations.
>
> Mr. FINLEY. Within all the States and Territories? What Indians?
>
> Mr. BURKE of South Dakota. The South Dakota Indians probably more than any others.

40 Cong.Rec. 3600 (March 9, 1906).

Plaintiff has offered no reason why the belief of the Burke Act's sponsor as to its applicability should have been incorrect, and the court perceives none. The Burke Act was clearly meant to, and in fact did, apply to allotments in South Dakota.

### II.

### NECESSITY OF AN APPLICATION FOR A PATENT UNDER THE BURKE ACT.

Plaintiff's next major contention is that the Burke Act contained a requirement for an application by the allottee before a fee patent could be issued, and that any patent issued in the absence of such application is necessarily void. The lan-

---

**1.** *See* the summary of these Acts cited in the General Factual Background, *supra.*

**2.** The principal cases cited in support of the contention that the Burke Act does not apply to South Dakota are *United States v. Nice,* 241 U.S. 591, 36 S.Ct. 696, 60 L.Ed. 1192 (1916) and *Seaples v. Card,* 246 F. 501 (E.D.Wash.1915). Neither are authority for this argument. *Nice,* which overruled *Matter of Heff, supra,* never addresses the Burke Act, and its silence can

hardly be construed as a ruling on the applicability or inapplicability of the Burke Act in South Dakota. *Seaples* holds the Burke Act inapplicable to Indian *homesteads* granted under 1875 and 1884 Acts; these, unlike the 1889 Act creating South Dakota reservations, obviously did not incorporate the section of the Dawes Act dealing with *allotments* that was amended by the Burke Act.

guage of the Burke Act contains no such explicit requirement; indeed, in the context of another case, this court once observed that the codified version of the Burke Act, 25 U.S.C. § 349, was "one of a number of statutes enacted in the early portion of the twentieth century giving the Secretary unilateral power to either issue patents in fee to the Indian owners or to sell individual trust allotments to others." *Sampson v. Andrus*, 483 F.Supp. 240, 242 (D.S.D.1980). It is fundamental that when a statute is phrased in plain language, a court need look no further than that language in the interpretation of the statute. *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917).[3] Given the clear absence of the words "upon application" from the Burke Act, the court should ordinarily conclude from that alone that no such requirement can be implied. Given the magnitude and persistence of plaintiff's claims, however, the court, in the interest of reaching a final disposition of this controversy, will proceed to consider the other arguments dealing with the issue of the application requirement.

■ First, the court has been provided with copies of the legislative history of the Burke Act. There is no explicit discussion of an application requirement in this history; what remarks that can possibly be construed as bearing on this issue are conflicting and unpersuasive. The strongest language in support of an application requirement is the following exchange:

> MR. DIXON of Montana: Mr. Speaker, I want to ask the gentleman from South Dakota [Mr. Burke] if the purpose of the bill is not to prevent the blanket Indians by wholesale become citizens by allotments, and still allow the intelligent Indi-

ans *on application* to become citizens by allotments?

> MR. BURKE of South Dakota: That is the purpose of the law, and, further, to protect the Indians from the sale of liquor.

40 Cong.Rec. 3600 (daily ed. March 9, 1906). (Emphasis supplied). While the question it is true, does use the word "application",[4] it does not say that an allottee may *only* get a fee patent by making application; it says merely that Indians are "allowed" to apply. Indeed, just a few months earlier in the debate, the following remarks were made:

> MR. MONDELL: Now, under this legislation the Indian remains the ward of the Government for twenty-five years after he takes his allotment, unless in the meantime *the Secretary of the Interior sees fit to make him a citizen by granting him a patent in fee simple.*

> .  .  .  .  .

> MR. CURTIS.... Now, this bill, if enacted, will leave [an allottee] under the control of the Government until he secures a patent conveying the fee, whether he gets it under an agreement or whether *it is issued to him* under the law by the Secretary of the Interior.

*Id.* at 3599. (Emphasis supplied). Although these statements certainly would not foreclose an application requirement in the Burke Act, the remarks, both in the absence of any reference to applications and in the very great discretion that seems to be attributed to the Secretary (particularly in Representative Mondell's "sees fit" language) tend to imply that the Secretary would have sufficient power under the Burke Act to issue patents without applica-

---

**3.** As *American Bankers Insurance Co. of Fla. v. United States*, 265 F.Supp. 67, 73–74 (S.D.Fla. 1967), put it so well, it is

the duty of the Court to apply statutes on what Congress might have written.... Where the meaning of a statutory provision is clear, that language is the sole indication of legislative intent. Courts may not then resort to legislative history to aid in ascertaining

Congressional intent. The statute, read with common sense, will be held to mean simply what it says and will be enforced as written.

**4.** The reference to "blanket" Indians becoming citizens "wholesale ... by allotment" is of course an allusion to the ruling in *Heff*, which found that Indians became citizens as soon as the trust allotment was initially issued.

tions,[5] if that was the policy the Secretary chose to follow.

Further, although it is also not directly probative of the intent of Congress in the portion of the Burke Act at issue here, the court cannot overlook the Senate amendment added to the Burke Act, which provides, in pertinent part, that when an allottee died "before the expiration of the trust period, said allotment shall be cancelled ... and the Secretary of the Interior ... shall cause to be issued to [the] heirs ... a patent in fee simple for said land." 40 Cong.Rec. 5805 (daily ed. April 25, 1906). While it may be true, as plaintiff contends, that the heirship problem was of a different nature than that dealt with by the rest of the Burke Act, it is yet significant that a clause giving the Secretary clearly unilateral power to terminate the trust period of an allotment was enacted with the rest of the Burke Act. Had Congress intended that the Secretary make such a crucial distinction between the two situations contemplated by the Burke Act, i.e., to require an application for a fee patent from living allottees while requiring no such applications from the heirs of deceased allottees, it would seem probable that Congress would itself have made this distinction explicit in its drafting of the Burke Act.

Plaintiff argues that the 1906 Burke Act must be interpreted in the light of a proposed 1905 measure which failed to gain passage:

> That hereafter the Secretary of the Interior be, and he is hereby, authorized to issue a patent in fee simple to any adult mixed-blood Indian to whom a trust or other patent has been issued, containing restrictions upon alienation, and upon the issuance of such patent in fee simple all restrictions as to sale, incumbrance, or taxation of the land so patented are hereby removed. *Provided*, that such patent shall not be issued until *after the said*

> *Secretary has carefully considered the application and is fully satisfied that the applicant is competent to transact his own business, and that it will be for his best interest to have the patent issued.*

39 Cong.Rec. 1155 (daily ed. January 20, 1905) (Emphasis supplied). All the court perceives from this failed legislation was that Congress knew how to put application language into this type of bill when that was its intent. This is amply demonstrated by a number of other statutes that were enacted into law during the same time period as the Burke Act. The Act of July 1, 1902, 32 Stat. 636, for instance, provided that the Secretary, upon "request" of an adult member of the Kaw tribe, could remove the restrictions on alienation if he was satisfied the Indian was competent. The Act of April 21, 1904, 33 Stat. 189, 204, empowered the Secretary to remove the restrictions on alienation on land held by members of the Five Civilized Tribes "upon application" and after investigation of the allottee. The Act of June 14, 1906, 34 Stat. 262, 263, passed shortly after the Burke Act, authorized the Secretary "upon application" to issue a fee patent to Indians with land allotted in drainage districts. The Act of June 21, 1906, 34 Stat. 325, 353 (the Clapp Amendment) unilaterally removed restrictions on land held by adult mixed-blood Indians within the White Earth Reservation in Minnesota, and allowed the Secretary, "upon application", to remove restrictions on land held by full-blood Indians when he found them competent. The Act of June 28, 1906, 34 Stat. 539, 542, authorized the Secretary, upon a finding of competency and "at the request and upon the petition" of an allottee, to issue a fee patent to an Osage Indian. Application language also appears in the Act of May 29, 1908, 35 Stat. 444, dealing with sale of allotted land, and the Act of June 25, 1910,

---

**5.** An argument might be made that Representative Curtis' remarks, cited *supra*, in employing the reference to an allottee "securing" a patent, imply an application. The word is used, however, both in the context of the patent being issued by the terms of the "agreement"—treaty or statute—creating the allotment, i.e., by the eventual completion of the twenty-five year trust period, as well as action by the Secretary under the Burke Act. There is thus no logical reason to read "secure" as equivalent to "apply".

36 Stat. 855, 856, also dealing with the removal of restrictions on alienation.

On the other hand, several other statutes from the same time period dealing with the same subject contain no application language. The Act of June 21, 1906, 34 Stat. 325, 381, gave the Secretary the power to grant a fee patent to any Indian of the Oneida Reservation, making no reference to an application. No application language appears in the Act of May 27, 1908, 35 Stat. 312, allowing the Secretary to remove restrictions on land held by members of the Five Civilized Tribes. The Act of June 25, 1910, 36 Stat. 855 at 855–856 and the Act of February 14, 1913, 37 Stat. 678 (amending the 1910 Act), codified at 25 U.S.C. §§ 372, 373, also authorized the Secretary to issue fee patents to heirs of deceased allottees, with no mention of an application requirement.[6]

It is true that the case of *United States v. Benewah County*, 290 F.628, 631–32 (9th Cir.1923), seems to state that the existence of application language in two other contemporaneous statutes dealing with fee patents required the court to read "upon application" into the Burke Act.[7] But the facts of *Benewah County* presented only the issue of whether land patented without application under the Burke Act retained its immunity from taxation. As will be discussed at Part III, *infra*, this is an issue entirely distinct from the issue of whether restrictions on alienation could be removed without application. Thus, any discussion by *Benewah County* of application requirements is not particularly applicable to the facts of this case. In any event, the *Benewah County* reasoning is contrary to the rule that a "change in the wording of a statute ordinarily imports a change of meaning unless a contrary intent plainly appears." *Altieri v. United States*, 295 F.Supp. 269 (Cust.Ct.1969) *see also Klein v. Republic Steel Corporation*, 435 F.2d 762, 765–66 (3rd Cir.1970): "where ... the words of a later statute differ from those of a previous one on the same or a related subject, the legislature must have intended them to have a different meaning." While it is true that this rule is not "decisive, or even strong ... [and must be applied] only ... when we compare very similar statutes", *United Steelworkers of America v. Marshall*, 647 F.2d 1189, 1232 (D.C.Cir. 1981), this rule is still "some evidence of congressional intent", *Id.* Given the striking similarity of the Burke Act to the other contemporaneous statutes cited *supra*, some of which do, and some of which do not, require applications for fee patents, the court must consider these other stat-

---

6. It is also at least somewhat significant to note that Congress, at several times during this period, itself unilaterally removed restrictions on alienation. *See* the Clapp Amendment, cited *supra*; Act of June 21, 1906, 34 Stat. 325, 363; Act of May 27, 1908, 35 Stat. 312 (removing restrictions on basis of blood quantum of allottees of Five Civilized Tribes).

7. The *Benewah County* court neglected to mention those contemporaneous statutes which also did not mention application language, and particularly did not mention the contemporaneous Amendment of Clapp of June 21, 1906, ch. 3504, 34 Stat. 325, 353, *amended by* Act of Mar. 1, 1907, ch. 2285, 34 Stat. 1015, 1034 which unilaterally removed all restrictions on allotments held by adult mixed-blood Indians in the White Earth Reservation in Minnesota, and which was upheld in *United States v. First National Bank*, 234 U.S. 245, 34 S.Ct. 846, 58 L.Ed. 1298 (1914). *First National Bank* stated, *inter alia*, that "the legislation here in question is not in the nature of contract, and contains no provision that makes it effectual only upon consent of the Indians whose rights and privileges are to be affected." 234 U.S. at 259, 34 S.Ct. at 850. This argues strongly against the general statutory requirement of application or consent for fee patents that *Benewah County* believed to exist.

Also, *Benewah County* makes the remark that the application requirement must be incorporated in the Burke Act "in light of the principles of law here involved", 290 F.2d at 631. This apparently alludes to the canon of construction, frequently urged by plaintiff, that provisions of Indian law are to be interpreted to give the maximum protection to Indian rights. But, as *Irving v. Clark*, 758 F.2d 1260, 1265 (8th Cir. 1985), put it: "Highly malleable rules of statutory construction must have some limit, and the Supreme Court has also stated that '[l]egislation dealing with Indian affairs "cannot be interpreted in isolation but must be read in light of the common notions of the day and the assumptions of those who drafted them," ' " citing *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 666, 99 S.Ct. 2529, 2537, 61 L.Ed.2d 153 (1979).

utes as an additional indication that Congress did not intend the Burke Act to require an application from the allottee.

It has also been argued in behalf of the plaintiffs in these cases that the Burke Act, read in the context of the Dawes Act which the Burke Act amended, necessarily supports plaintiff's position. In plaintiff's view, the main purpose of the Dawes Act in establishing the allotment system was to create an express twenty-five year trust to protect the allottees. Plaintiff contends an interpretation of the Burke Act to allow the issuance of patents without an application necessarily assumes that the Burke Act was an implied repeal of the supposed main purpose of the Dawes Act. Implied repeals are, of course, disfavored by law, and plaintiff urges that Congress would have been unlikely to enact such "a complete reversal" of the policy of the Dawes Act with so little discussion. While it certainly cannot be denied that *one* purpose of the Dawes Act was to provide some protection to the allottee during the trust period,[8] it must also be kept in mind that the Dawes Act, like other federal statutes during this period, was part of a

> policy of encouraging the assimilation of Indians into the white man's culture.... This policy was carried out by "alloting" to individual Indians sufficient resources to enable them to become independent farmers and ranchers.... As stated in [a] Senate Report [in 1907]:
>
>> The policy of allotting Indian lands in severalty, so as to break up the old tribal relations, has been going on for years. Ultimately, the Indian must become a citizen and work upon the new lines necessarily created by his present environments. He must learn to farm,

to raise livestock, and to abandon the aboriginal methods of life. Large areas of Indian lands have already been thus allotted, and many of the tribes have become farmers and stock raisers.

*United States v. Overlie,* 730 F.2d 1159, 1162 (8th Cir.1984). Certainly, it was but a continuation of this policy to its logical conclusion to grant the Secretary of the Interior the power to determine, in his discretion, whether some Indians had advanced so far under the allotment system that it was time for the United States to relinquish its control over the allotment, and thus reach the final stage in "assimilating" the Indian to white society.[9] The court can detect nothing in this policy and the part played in it by the Dawes Act, that would necessarily require an application by the allottee for a fee patent. Further, to the extent the Burke Act did constitute a departure from the Dawes Act, Congress was clearly aware of this change. The court's attention has been directed to Representative Burke's remark in the debate that his Act "is in accordance, in my opinion, with what the original allotment law contemplated, and what was considered to be the law until the decision of the Supreme Court last April held otherwise", 40 Cong.Rec. 3600 (daily ed. March 9, 1906), alluding to *Heff, supra.* This means only that Burke intended to clarify the language of the Dawes Act which *Heff* had construed as granting citizenship upon the issuance of the initial trust allotment. But Burke also knew he was changing the law, as shown by an exchange earlier in the debate:

---

**8.** The exact nature of this protection is less clear than plaintiff would have this court believe. *United States v. Mitchell* (I), 445 U.S. 535, 543, 100 S.Ct. 1349, 1354, 63 L.Ed.2d 607 (1980), described it as a "trust ... of limited scope." On *Mitchell's* remand, the Court of Claims noted that the "purposes of the special trust provision of the General Allotment [Dawes] Act ... did not include a true fiduciary or guardianship relationship toward the Indian-owners." *Mitchell v. United States,* 229 Ct.Cl. 1, 664 F.2d 265,

275 n. 18 (1981), *aff'd.* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (Mitchell II).

**9.** *See County of Thurston, State of Neb.,* 586 F.2d 1212, 1219 (8th Cir.1978): The Burke Act "and similar enactments of the period were intended to accelerate the assimilation of the Indians by truncating the length of the trust period and the benefits derived therefrom for Indians determined to be competent", *citing* the Clapp Amendment.

MR. CRUMPACKER. Under the law as it now stands, the Secretary of the Interior does not have authority to issue fee simple patents to Indians whom he may conclude are entitled to them?

MR. BURKE of South Dakota. That is true.

*Id.* at 3599.

Nor is plaintiff's position supported by the portions of the legislative history which discuss the necessity to relieve Congress of the burdens of special legislation to grant fee patents to individual allottees by vesting this power in the Secretary. This purpose of the Burke Act is made clear by the House Report, itself written by Burke, accompanying the Act:

> In the opinion of this committee this provision is advisable, as it will make it unnecessary for legislation granting fee-simple patents to individual Indian allottees, as has been done in every session of Congress for several years, and it *places the responsibility upon the Secretary of the Interior and the Indian Department, who know best when an Indian has reached such a stage of civilization as to be able and capable of managing his own affairs.*

H.R.Rep. 1558, 59th Cong., 1st Sess., Feb. 21, 1906 at 2. (Emphasis supplied). This aspect of the Burke Act was very attractive to members of Congress; in the first discussion of the Burke Act on the floor of the House, the following typical observations were made:

> MR. LACEY: I would like to say, in this connection, that the proposition of having a general law is superior to the present method. Under a general law the Indian Department would release the Indian and give him a patent with full authority as provided by the law through these special acts. *Now, by giving this privilege*

*always through a special act and by naming the party in an appropriation bill there is much more danger that some name will slip in without being duly considered than there would be if the matter were handled by general law,* because between the two Houses an amendment could be inserted on the floor of the House *adding this name or that name, with little or no consideration. That could not occur if the matter were provided for by general law instead of in this special way.*

40 Cong.Rec. 3552 (daily ed. March 8, 1906) (Emphasis supplied.) The difficulty with this material is that it really proves little beyond the fact Congress wished to pass one of its burdens onto the Secretary of the Interior, who was more closely concerned with Indian affairs. Notwithstanding plaintiff's arguments to the contrary, nothing in this history suggests that Congress felt the Secretary should follow any particular method in carrying out his new powers, or that Congress would have necessarily disagreed with a Secretarial policy of granting fee patents without application on the basis of age and blood quantum, methods that Congress itself occasionally utilized.[10] *See* footnotes 6 and 7, *supra,* and the discussion of the Clapp Amendment in Part IV, *infra.* Congress did no more than determine that the Secretary was in the best position to decide when and how fee patents should be issued, and gave him the discretion to do so.

It is true that the Interior Department, from 1906 to 1915, followed an administrative policy that, in effect, required applications for fee patents. It is argued that this supports plaintiff's position under the familiar rule that contemporaneous interpretation of a statute by the agency charged with its administration is evidence of the

---

**10.** H.R.Rep. 1558, cited above, also contains a copy of a letter from Indian Commissioner Leupp, praising the Burke Act for its potential in reducing the number of "wards of the Government", and stating that the "bill makes it the duty of the Secretary ... to satisfy himself of the civic competency of the allottee concerned. Through [his officers] the Secretary can make a thorough investigation of each case and take only such action as the facts may warrant." Significantly, even Leupp's remarks fall short of stating that no fee patent would be issued without an application, or that agents of the Secretary "must" investigate each case, using instead the more permissive verb "can."

Congressional intent behind the statute, although plaintiff concedes that it is not "definitive" evidence. Yet, nothing in the letters and reports by Indian Commissioner Leupp and others in the years immediately following the passage of the Burke Act expressly state that the Act *mandates* applications or detailed investigations before the issuance of fee patents. Rather than any special awareness of Congressional intent, these materials merely reflect that, under the great discretion granted by the Burke Act, the Secretary at first chose to proceed with an application requirement, just as the Secretary, after 1915, chose to dispense with the application procedure. Both methods seem to have been acceptable interpretations of the Burke Act, although the 1916–1921 interpretation actually appears closer to a strictly correct reading of the statute.[11]

Thus, the court can find nothing in the extensive material relating to the Burke Act and its historical circumstances that would lead the court to add the words "upon application" to the plain language of the Burke Act. If such language is to be implied in the statute, it must come from a source other than the statute itself.

## III.

### APPLICATION REQUIREMENT UNDER DUE PROCESS.

■ Plaintiff argues that the allottee at issue in this case had a vested right under the Due Process Clause of the Fifth Amendment to the United States Constitution to have the restrictions on alienation kept on the allotment until the trust period ended by the expiration of the time under the governing statutes, or the allottee applied for a fee patent. This issue was thoroughly explored by the courts in the

first half of this century, and the weight of authority is firmly against plaintiff's position.

The source of the law on this issue is the venerable case of *Choate v. Trapp*, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941 (1912). This considered whether the state of Oklahoma could levy property taxes on land allotted to Indians under an Act providing that the allotments would be restricted against alienation and exempt from taxes. In 1908, Congress enacted a statute which removed both the restrictions on alienation and the tax immunity of the land. The Supreme Court held that the tax immunity was a valuable property right, and as such was "protected from repeal by the provisions of the Fifth Amendment." *Choate, supra,* 224 U.S. at 678, 32 S.Ct. at 570. In so ruling, however, the Court expressly distinguished between the "right" of tax exemption and the restrictions on alienation:

> the exemption and nonalienability were two separate and distinct subjects. One conferred a right and the other imposed a limitation ... The right to remove the restriction was in pursuance of the power under which Congress could legislate as to the status of the ward and lengthen or shorten the period of disability. But the provision that the land should be non-taxable was a property right, which Congress undoubtedly had the power to grant.

224 U.S. at 673, 32 S.Ct. at 568.

Several years later, the issue was again placed before the Court in *Williams v. Johnson*, 239 U.S. 414, 36 S.Ct. 150, 60 L.Ed. 358 (1915). There, it was argued "that the restriction upon alienation was a protection to [the allottee] 'against his own improvident acts', that it was 'not a person-

---

**11.** Some further arguments are made about Representative Burke's participation in the enactment of the portion of the Act of June 25, 1910, 36 Stat. 855, dealing with the removal of restrictions on alienation on Indian lands other than allotments. Plaintiff points out that the law, as enacted, contained application language. The legislative history, at 45 Cong.Rec. 6081 (daily ed. May 11, 1910) however, discloses that

the language originally proposed by Burke contained *no* application language, but was later added by a Senate-House committee which included Burke. This evidence is thus inconclusive at best.

Also, the 1923 statement by Burke that he had intended his 1906 Act to require applications is too far removed in time to be probative.

al privilege and repealable', but was 'an incident attached to the land itself', and 'was to him property as much as the land itself.' " 239 U.S. at 419, 36 S.Ct. at 151. Rejecting this contention, the Court did no more than repeat the language from *Choate* cited above, and state that "Congress has plenary control over tribal relations and property, and that this power continues after the Indians are made citizens, and may be exercised as to restrictions upon alienation." 239 U.S. at 420, 36 S.Ct. at 152.

Similar reasoning was used by the Supreme Court in several cases after *Choate* and *Williams. United States v. Nice,* 241 U.S. 591, 598, 36 S.Ct. 696, 60 L.Ed. 1192 (1916), for instance, remarked that

> when the Indians are prepared to exercise the privileges and bear the burdens of one *sui juris,* the tribal relation may be dissolved and the national guardianship brought to an end; but it rests with Congress to determine when and how this shall be done, and whether the emancipation shall at first be complete or only partial.

Virtually identical language was used in *United States v. Waller,* 243 U.S. 452, 459–460, 37 S.Ct. 430, 431–32, 61 L.Ed. 843 (1917). *Jones v. Prairie Oil & Gas Co.,* 273 U.S. 195, 199, 47 S.Ct. 338, 339, 71 L.Ed. 602 (1927), took the issue to be so well settled that the court made the statement that it "is not open to dispute that the removal by the later act of Congress ... of the restriction upon alienation previously imposed, is valid." In fact, in *Fink v. Board of County Commissioners,* 248 U.S. 399, 404, 39 S.Ct. 128, 130, 63 L.Ed. 324 (1919), the Court actually took the view that the removal of restrictions on alienation, far from constituting a taking of a property right, actually added to the value of the land:

> We may here invoke the commonplace, for it is commonplace to say that we only know the value of a thing by that which

makes its worth. Under the *restriction* against the alienation the *land* had no worth but in its uses; the restriction removed, it had the added worth of exchangeability for other things,—a power of sale was conferred. To say there was no value in that power is to contradict the examples and estimations of the world.

The distinction between tax immunity and restrictions on alienation, and the differing power of Congress over the two aspects of trust allotments, has been generally observed by the lower courts. As *United States v. Benewah County,* 290 F. 628, 631 (9th Cir.1923), put it, there "can be no serious question of the authority of Congress to remove restrictions upon the alienation of the lands of allottees with or without the latter's consent ... But to remove restrictions upon alienation is a different thing from depriving Indian allottees of the immunity from taxation conferred upon them by their trust patents".[12] Making much the same point are *United States v. Board of County Commissioners of McIntosh County,* 154 F.2d 600, 603 (10th Cir. 1946) ("It is well settled that restrictions against alienation and exemption from taxation of lands owned by Indians are separate and distinct subjects, not dependent upon each other."); *United States v. Hester,* 137 F.2d 145, 147 (10th Cir.1943) ("restrictions against alienation and non-taxability are separate and distinct subjects."); *United States v. Spaeth,* 24 F.Supp. 465, 468 (D.Minn.1938) ("That Congress had the authority to remove the restrictions upon the alienation of the lands of the allottees under the trust patents before the expiration of the twenty-five year period cannot be questioned ... while it was necessary to obtain the Indian's consent to divest him of the guaranteed non-taxable land during the twenty-five year period, it was not necessary to obtain his consent to clothe him with authority to alienate his land."); *Unit-*

---

**12.** As noted above, *Benewah County* proceeded to read application or consent language into the Burke Act, a reading followed in *United States v. Ferry County,* 24 F.Supp. 399, 401 (E.D.Wash. 1938). The outcome in *Benewah County,* in its

determination that tax immunity survived on allotments after patents, was dictated by *Choate,* and the finding that an application was required under the Burke Act was therefore unnecessary to the court's ruling.

ed *States v. Ferry County*, 24 F.Supp. 399, 401 (E.D.Wash.1938) ("The Congress may remove restrictions to alienation with or without the consent of the allottees ... but such is a clear distinction from depriving the allottees, without their consent, of the vested right to hold land free from taxation for 25 years."); *see also United States v. Getzelman*, 89 F.2d 531, 536 (10th Cir.1937) ("The power of Congress to impose, extend, or reimpose restrictions on property of an Indian ward is plenary and not open to doubt."); *Johnson v. United States*, 283 F. 954, 955 (8th Cir.1922) ("The purview discloses plainly and clearly a legislative intention to remove restrictions under given conditions; and we find no difficulty in sustaining both. ...").

It is true that *State v. Zay Zah*, 259 N.W.2d 580 (Minn.1977), takes a different view of the law in this area. *Zay Zah* was another case involving the Clapp Amendment, *see* footnotes 6 & 7, *supra*, and the discussion under Part IV, *infra*, and the involuntary removal of restrictions on allotments in the White Earth Reservation in Minnesota by Congress. Contrary to the cases just immediately cited, *Zay Zah* reasoned that because the land at issue had retained, under *Choate*, its immunity from taxation during the trust period, it had also retained *all* of its trust aspects. "The vested right to be free from state taxation must derive from somewhere, and its only possible source was the trust patent itself. After all, it is the land which is exempt from property tax, not the individual who happens to own or possess the land at any given time." 259 N.W.2d at 584. "If the Clapp Amendment was ineffective to destroy the tax exemption during this period, it must also have been ineffective to destroy the legal source of that exemption, namely, the trusteeship established by the patent." 259 N.W.2d at 586. If the trust relationship was still intact, then, by implication, the restrictions on alienation still stood.

Bluntly put, *Zay Zah* is clearly wrong. The heavy weight of authority, from *Choate* and all its federal progeny, virtually all of which was ignored by *Zay Zah*, is that there *is* a distinction between tax exemption and the other trust attributes of an allotment, particularly the restrictions on alienation. As the Eighth Circuit has recently put it, commenting directly on *Zay Zah*, extension of *Zay Zah's* reasoning beyond its facts, tax forfeiture of allotments, "may be erroneous in light of the long-standing distinction drawn by this Court and the United States Supreme Court that the Clapp Amendment was unconstitutional to the extent it attempted to end the tax exempt status of allotments so long as the trust status continued ... but constitutional to the extent it removed the restrictions on alienability of the allotment." *Spaeth v. United States Secretary of Interior*, 757 F.2d 937, 943 (8th Cir.1985).

There can thus be no viable argument that, in designing the Burke Act to allow the Secretary to issue fee patents to Indians even in the absence of an application, Congress committed any constitutional violations. As the case law from *Choate* on down makes plain, restrictions on alienation are nothing more than a "limitation" on property, which may be removed whenever and in whatever method Congress may choose.[13]

## IV.

## COMPETENCY BY DETERMINATION OF AGE AND BLOOD QUANTUM

A second main thrust of plaintiff's case is that the Secretary could not permissibly make competency decisions under the Burke Act on the basis of age and blood quantum, and that all fee patents issued on the basis of such determinations are void. Plaintiff argues, initially, that the Burke Act requires what plaintiff calls an "individual" determination of competency. Precisely what is meant by "individual" is not clear. Certainly, there was an "individual"

---

**13.** Even if an application or consent requirement were to be found in the Burke Act or the Constitution, a substantial argument can be made, *see* Part V of this opinion, that the facts of this case demonstrate consent to the fee patent by the allottee involved.

finding that each allottee met the age and blood standards. The language of the Act itself only states that the Secretary "may, in his discretion ... whenever he shall be satisfied that any Indian allottee is competent and capable of managing his or her affairs," issue a fee patent. This language itself does not purport to lay down any standards that the Secretary is bound to follow in making this competency determination. As the analysis of the legislative history earlier in this opinion demonstrated, the intent of Congress seems to have been no more than to turn the burden of deciding when to issue fee patents over to the Secretary, and to give him very broad discretion in deciding the proper time and procedure to follow in making his decisions.

Perhaps the strongest authority for plaintiff in this respect is *United States v. Debell*, 227 F. 760 (8th Cir.1915), which was an attempt by the United States to cancel a fee patent issued under the Burke Act in 1908, *before* the promulgation of the blood quantum test at issue in this case. In *Debell*, there was strong evidence of fraud and collusion to induce the Secretary to believe an Indian was competent under the standards then used, so that a fee patent might be issued and the Indian's land could be bought at less than its value. In considering whether the Secretary's competency decision had been valid, the court stated that a competency test under the Burke Act should have particular attributes:

> It is indispensable to that competency and capability to manage his affairs which conditions the right of the Secretary to issue a patent in fee simple to an Indian under the [Burke Act] that he shall have at least sufficient ability, knowledge, experience, and judgment to

enable him to conduct the negotiations for the sale of his land and to care for, manage, invest, and dispose of its proceeds with such a reasonable degree of prudence and wisdom as will be likely to prevent him from losing the benefit of his property or its proceeds.

227 F. at 770.[14] *Debell* found that if the Secretary followed any other test, "he committed [an] error of law." *Debell* also found that the Indian involved in the case was indeed "incompetent ... and that the patent in fee simple and the deed to the [original purchaser] were evasive violations of the settled policy of the nation to preserve and protect incompetent Indians." *Id.* Yet, the court refused to cancel the patent and return the land to trust status because it had already been sold to an innocent third party, stating that the original conveyance was "voidable, but it was not void because the United States had issued to [the Indian] its patent in fee simple." 227 F. at 771. "The title of a bona fide purchaser of land subsequent to the issue of the patent is superior to the equitable claim of the United States [acting in behalf of the Indian] to avoid it for fraud *or error of law* in the issue of it." 227 F. at 763. (Emphasis supplied.) The point of *Debell*, and its significance for this case, is clear: whatever legal errors may have been made in a Secretarial competency decision under the Burke Act, even to the point of finding incompetent Indians competent, these errors do not rise to such a level as to render void the issuance of the patent, at least where, as here, the rights of innocent third party purchasers are involved. This conclusion is buttressed by *Mitchell v. United States*, 229 Ct.Cl. 1, 664

---

**14.** *See also Ex Parte Pero,* 99 F.2d 28, 35 (7th Cir.1938), which stated that

> under Section 349 it is obvious that the Secretary of the Interior in exercising his discretion to issue a patent in fee simple to a trust allottee ought to be satisfied not only that the allottee is competent and capable of managing his or her affairs, but also that it would be to the best interest of the allottee for the allottee to become emancipated from the exclusive jurisdiction of the United States and

> become subject to the laws of the state in which he resides.

This language is largely dicta, however, since no fee patent was actually issued in *Pero, see* 99 F.2d at 32, but instead involved was the issuance of a competency certificate under 25 U.S.C. § 372. In any event, *Pero*, which involved a question of state criminal jurisdiction, did consider the validity of a fee patent issued in violation of what the *Pero* court took to be the requirements under 25 U.S.C. § 349.

F.2d 265, 275 (1981), *aff'd.* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983):

we deny entitlement to any recovery under 25 U.S.C. §§ 349 [the Burke Act], 377 ... which deal with the issuance of fee patents to Indians found by Interior to be competent. Though the underlying land is held in a limited trust ... this fee-patent legislation suggests little of the assumption of fiduciary responsibility.... The statutes seem almost purely regulatory, invoking Congress's plenary power over Indians, and do not themselves mandate any compensation ... for such alleged injuries as failing properly to determine whether or not an Indian was competent to obtain an allotment, or for issuing patents to incompetents despite the statute.

Regardless of the language in *Debell*, however, the court is of the view that the competency decision made by the Secretary in this case on the basis of age and blood quantum was within his legal authority. The central case on this issue is *United States v. Waller*, 243 U.S. 452, 37 S.Ct. 430, 61 L.Ed. 843 (1917), decided April 9, 1917, just a week before the promulgation of the "Declaration of Policy" by which the Secretary undertook his policy of determining competency by blood quantum. This was an action in which the United States was seeking to cancel deeds made by Indians on the White Earth Reservation in Minnesota after the passage of the Clapp Amendment, which removed all restrictions on allotments held by adult mixed-blood Indians. In affirming the dismissal of the action, the Court held:

This distinction between the qualifications of adult mixed and full-blood Indians is one which Congress has not infrequently applied. ... [The Clapp Amendment] thus evidences a legislative judgment that adult mixed-blood Indians are, in the respects dealt with in the Act, capable of managing their own affairs, and for that reason they are given full power and authority to dispose of allot-

ted lands. This may be a mistake of judgment as to some cases.... But Congress dealt with general conditions, and with these classes of Indians as a whole, and, with authority over the subject, has given to adult mixed-blood Indians the full right to dispose of the lands in question. It is not for the courts to question this legislative judgment.

243 U.S. at 462, 37 S.Ct. at 433. *See also United States v. First National Bank*, 234 U.S. 245, 259–260, 34 S.Ct. 846, 849–50, 58 L.Ed. 1298 (1914) (also upholding Clapp Amendment; disastrous after-effects of legislation "can have little weight in determining the meaning of the legislation, and certainly cannot overcome the meaning of plain words used in legislative enactments. Congress has in other legislation not hesitated to place full-blood Indians in one class and all others in another."); *Tiger v. Western Investment Co.*, 221 U.S. 286, 31 S.Ct. 578, 55 L.Ed. 738 (1911); *United States v. Spaeth*, 24 F.Supp. 465 (D.Minn.1938).[15]

Thus, plaintiff is asking this court to declare illegal a Secretarial policy upheld in several contemporaneous decisions by the United States Supreme Court. It is argued, of course, that the distinction between this case and those just cited is that here there is a policy promulgated by the Secretary of the Interior, while the policies in *Waller, supra, First National Bank, supra, Tiger, supra,* and *Spaeth, supra,* were enacted by Congress itself. It is much too late in the day for such a contention to carry any weight.

As the Supreme Court recently stated, when "Congress explicitly delegate[s] authority to construe the statute by regulation ... we must give the regulations *legislative* and hence controlling weight unless they are arbitrary, capricious, or plainly contrary to the statute." *United States v. Morton*, 467 U.S. 822, ——, 104 S.Ct. 2769, 2776, 81 L.Ed.2d 680, 691 (1984) (Emphasis supplied.) Or, as *Batterton v. Francis*, 432 U.S. 416, 425, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977) put it: when Congress delegates

---

**15.** *Delaware Tribal Business Committee v. Weeks,* 430 U.S. 73, 97 S.Ct. 911, 51 L.Ed.2d 173 (1977) also upheld distinctions between tribal members.

to the Secretary the power to implement a statute,

> Congress entrusts to the Secretary, rather than to the courts, the primary responsibility for interpreting the statutory term. In exercising that responsibility, the Secretary adopts regulations *with legislative effect.* A reviewing court is not free to set aside those regulations simply because it would have interpreted the statute in a different manner.

(Emphasis supplied.) *See also United States v. Mersky,* 361 U.S. 431, 437–38, 80 S.Ct. 459, 463–64, 4 L.Ed.2d 423 (1960).

There can be no doubt that Congress had delegated to the Executive Branch the legislative power to promulgate regulations to implement the Burke Act. The 1878 Revised Statutes contained the following provisions:

> Sec. 441. The Secretary of the Interior is charged with the supervision of public business relating to the following subjects:

> \*    \*    \*    \*    \*    \*

> Third. The Indians....

> Sec. 463. The Commissioner of Indian Affairs shall, under the direction of the Secretary of the Interior, and agreeably to such regulations as the President may prescribe, have the management of all Indian affairs, and of all matters arising out of Indian relations.

> Sec. 465. The President may prescribe such regulations as he may think fit for carrying into effect the various provisions of any act relating to Indian affairs, and for the settlement of the accounts of Indian affairs.[16]

The effect of these statutes was interpreted in *United States v. Thurston County,* 143 F. 287 (8th Cir.1906). At issue there was the sale of trust lands by heirs of the original allottees under a 1901 Act, which sale was allowed under regulations promulgated by the Secretary of the Interior which imposed a condition that the proceeds be deposited in a bank. Stating that

the "acts of Congress authorized the Secretary to make those regulations for the purpose of carrying into effect the act of 1902, and, when made, *they had the force of statutory enactments,"* 143 F. at 291 (Emphasis supplied), the court cited Rev.St. §§ 441, 465.

▪ Thus, when the Secretary promulgated his policies in 1917 and 1919 that adult mixed-blood allottees were presumptively competent within the meaning of the Burke Act, his rules took on the attributes of legislation, and carried the same weight as Congressional enactments. As such, this court can only set them aside if they were arbitrary, capricious, or plainly contrary to the Burke Act. This question does not long detain the court. As noted above, the blood quantum policy adopted by the Secretary was a virtual duplicate of that enacted in the Clapp Amendment, and specifically upheld by the Supreme Court, in *Waller, supra.* It is illogical for this court to find that, ·by incorporating standards used by Congress itself in determining whether Indians should be issued fee patents, the Secretary acted either arbitrarily or capriciously. Nor can the court find that this policy was plainly contrary to the Burke Act. The Burke Act did no more than to vest discretion in the Secretary to determine how and when fee patents should be issued. In promulgating the blood quantum method, the Secretary exercised his discretion, evidently guided by the wording of other statutes and Supreme Court case law of the time, to choose one such method. That this method appears, to modern eyes, ill chosen, and in fact resulted in disastrous consequences to many of the Indians involved, does not allow this court to find that it was contrary to the provisions of the Burke Act. The policy was as much a law as the Clapp Amendment, and just as *Waller* found the Clapp Amendment to be a legitimate exercise of federal power, so must this court uphold

---

16. Clearly, this power to promulgate regulations could be and was delegated to the Secretary of the Interior and the Commissioner of Indian Affairs. *See United States v. Birdsall,* 233 U.S. 223, 34 S.Ct. 512, 58 L.Ed. 930 (1914).

the blood quantum policy under the Burke Act.

■ The argument has also been advanced that the blood quantum policy violated the equal protection component of the Fifth Amendment to the United States Constitution. The court entertains severe doubts as to whether equal protection is relevant to this case, since prior to *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), equal protection standards were repeatedly held to be inapplicable to actions by the federal government. *See Detroit Bank v. United States,* 317 U.S. 329, 63 S.Ct. 297, 87 L.Ed. 304 (1943); *Currin v. Wallace,* 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441 (1939); *Charles E. Steward Machine Co. v. Davis,* 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937). If equal protection is to be applied here, however, the test is that set forth in *Morton v. Mancari,* 417 U.S. 535, 555, 94 S.Ct. 2474, 2485, 41 L.Ed.2d 290 (1974): "As long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed." *See also Delaware Tribal Business Committee v. Weeks, supra,* 430 U.S. at 84–85, 97 S.Ct. at 918–19.[17]

*Morton v. Mancari* upheld Indian preference in Bureau of Indian Affairs employment under 25 U.S.C. § 472, which has been implemented by 25 C.F.R. § 5.1, stating, in part, that "a preference will be extended to persons of Indian descent who are ... (c) ... of one-half or more Indian blood." The *Mancari* court looked to the purpose of the preference, as evidenced by the legislative history, and found it in the Congressional determination that "proper fulfillment of its trust required turning over to the Indians a greater control of their own destinies." 417 U.S. at 553, 94 S.Ct. at 2484.

This purpose is not much different, in many respects, than that which underlay the Burke Act. As noted before, *see* footnote 10, *supra,* the letter of Indian Commissioner Leupp attached to the House report on the Burke Act, stated:

> There are many members of Indian tribes, full bloods, mixed bloods, and in some instances adopted white men, who are entirely competent to transact their own business and take their places in the ranks of our common citizenship. If such allottees are given full control of their property they will be absorbed into the community in which they reside and bear their share of burdens, while at the same time the number of 'wards of the Government' will be gradually reduced.

H.R.Rep. No. 1558, 59th Cong., 1st Sess., Feb. 21, 1906 at 4. This was entirely in agreement with the assimilationist views that dominated federal government policy at the time, *see United States v. Overlie,* 730 F.2d 1159, 1162 (8th Cir.1984), cited *supra,* and, to a considerable extent, the obligation recognized by the Supreme Court in *Mancari* " 'to prepare the Indians to take their place as independent, qualified members of the modern body politic' ", 417 U.S. at 552, 94 S.Ct. at 2483 citing *Board of County Commissioners v. Seber,* 318 U.S. 705, 715, 63 S.Ct. 920, 926, 87 L.Ed. 1094 (1943). Given these goals under federal Indian policy, this court cannot say that it was irrational, unwise though it may appear in retrospect, for the Secretary to determine that adult persons of one-half or less Indian blood were no longer in need of federal controls over their land, and to grant them the same independent powers held by all other citizens of the United States. The decision appears at least as rational as the unquestionably legal, under *Mancari,* determination by the Secretary that merely because a person has one-half or more Indian blood, he is entitled to a preference in employment by the Bureau of Indian Affairs "to further the cause of Indian self-government". *Mancari,* 417 U.S. at 554, 94 S.Ct. at 2484. The court

---

17. It is clear this test is applicable only "for judging the constitutionality of Indian legislation under the Due Process Clause of the Fifth Amendment"—not issues involving Congressional exercise of its power of guardianship. *United States v. Sioux Nation of Indians,* 448 U.S. 371, 413 n. 28, 100 S.Ct. 2716, 2739–40, 65 L.Ed.2d 844 (1980).

therefore finds itself unable to disturb, on equal protection grounds, the policy decisions made by the Secretary in 1917 and 1919.

## V.

### CONSENT BY ACTIONS FOLLOWING ISSUANCE OF THE FEE PATENT.

The prior portions of this opinion set out the reasons which persuade this court to conclude that plaintiff has no valid cause of action for the issuance of a "forced fee" patent. Though the court does not rest its decision on this ground, the court is also convinced that the actions of the allottee under whom plaintiff claims do, in fact, evidence consent to the issuance of the patent, if such consent was necessary.

The sources for this post-issuance consent theory arise essentially from two separate sources: the so-called Cancellation Acts of 1927 and 1931, and case law dealing with payment of state taxes assessed on patented trust land in spite of the prohibition of such taxes under *Choate v. Trapp, supra.*

The 1927 Cancellation Act is codified at 25 U.S.C. § 352a:

The Secretary of the Interior is hereby authorized, in his discretion, to cancel any patent in fee simple issued to an Indian allottee or to his heirs before the end of the period of trust described in the original or trust patent issued to such allottee, or before the expiration of any extension of such period of trust by the President, where such patent in fee simple was issued without the consent or an application therefor by the allottee or by his heirs: *Provided,* That the patentee has not mortgaged or sold any part of the land described in such patent: *Provided also,* That upon cancellation of such patent in fee simple the land shall have the same status as though such fee patent had never been issued. (Feb. 26, 1927, c. 215, 44 Stat. 1247.)

The 1931 Cancellation Act is codified at 25 U.S.C. § 352b:

Where patents in fee have been issued for Indian allotments, during the trust period, without application by or consent of the patentees, and such patentees or Indian heirs have sold a part of the land included in the patents, or have mortgaged the lands or any part thereof and such mortgages have been satisfied, such lands remaining undisposed of and without incumbrance by the patentees, or Indian heirs, may be given a trust patent status and the Secretary of the Interior is, on application of the allottee or his or her Indian heirs, hereby authorized, in his discretion, to cancel patents in fee so far as they cover such unsold lands not encumbered by mortgage, and to cause new trust patents to be issued therefor, to the allottees or their Indian heirs, of the form and legal effect as provided by sections 348 and 349 of this title, such patents to be effective from the date of the original trust patents, and the land shall be subject to any extensions of the trust made by the Executive order on other allotments of members of the same tribe, and such lands shall have the same status as though such fee patents had never been issued: Provided, That this section and section 352a of this title shall not apply where any such lands have been sold for unpaid taxes assessed after the date of a mortgage or deed executed by the patentee or his heirs, or sold in execution of a judgment for debt incurred after date of such mortgage or deed, and the period of redemption has expired. (Feb. 26, 1927, c. 215, § 2, as added Feb. 21, 1931, c. 271, 46 Stat. 1205.)

As can be seen from the language of both statutes, the word "consent" is used apart from, and in contrast to, the word "application." The reason for this is given in the House Report accompanying the 1927 Act:

Placing a voluntary encumbrance upon or disposing of land so patented must in law be considered as an acceptance of the fee patent and a waiver of the tax-exempt privileges of a trust patent, but where forced-patent land has neither

been encumbered nor sold by the patentee, such patent ought to be canceled on application made to the Secretary of the Interior.

H.R.Rep. No. 1896, 69th Cong., 2nd Sess. 2 (1927). The power of the Secretary to return patented land to trust status was expanded in 1931 to include land, parts of which had been sold, or which had been mortgaged but the mortgage satisfied. In the view of Congress, however, this type of land could not be dealt with by only a cancellation of the fee patent, but required the issuance of a new trust patent entirely, implying that the sale or encumbrance had put the land in a category different from that where no such sale or encumbrance had occurred. This seems consistent with the indications in the legislative history of the 1931 Act that Congress had not retreated from its 1927 view of the effect of sale encumbrance:

> MR. WILLIAMSON: The land that has been patented and has either been encumbered or sold by the Indian can not be reached. Nothing can be done in those cases, because, if a man mortgages or if he deeds, that is an equivalent to an acceptance of the patent and, so far as that land is concerned, the Indian is without recourse.

74 Cong.Rec. 3413 (daily ed. January 28, 1931). *See also* H.R.Rep. No. 2269, 71st Cong., 3rd Sess. 3 (1931), and the discussions of legislative history of these Acts, in *United States v. Frisbee*, 165 F.Supp. 883, 888 n. 4 (D.Mont.1958); and *United States v. Glacier County*, 74 F.Supp. 745, 747–748 (D.Mont.1947).

The taxation cases relevant to this issue are best typified by *County of Mahnomen v. United States*, 319 U.S. 474, 63 S.Ct. 1254, 87 L.Ed. 1527 (1943), yet another consideration of the ramifications of the Clapp Amendment. *Mahnomen* was an action by the United States to recover property taxes collected from an allottee who received a fee patent. In spite of the effect of the Clapp Amendment, as upheld in *Waller, supra,* in removing trust restrictions, the Court observed that the land

retained its tax exemption under *Choate.* In spite of *Choate,* however, the allottee could still consent to give up even the tax immunity: "[a]cceptance of Choate v. Trapp does not mean that an Indian, legislatively declared to be competent to handle his own affairs, cannot voluntarily decide to pay taxes for his own advantage and welfare." 319 U.S. at 477, 63 S.Ct. at 1256. Citing *Ward v. Love County,* 253 U.S. 17, 22, 40 S.Ct. 419, 421, 64 L.Ed. 751 (1922), the *Mahnomen* Court said that "the burden is upon one seeking recovery of the tax to establish that the payment was made involuntarily", *Id,* and because there was no evidence of involuntary payment in the record, the Court found the government not entitled to a recovery of the taxes.

*Mahnomen's* ruling differs somewhat from a series of earlier Ninth and Tenth Circuit cases, which basically hold that tax payments carry too many attributes of compulsion to be taken as indicia of consent to the issuance of the fee patent. *Board of Commissioners of Jackson County v. United States,* 100 F.2d 929 (10th Cir.1938); *Glacier County, Mont. v. United States,* 99 F.2d 733 (9th Cir.1938); *United States v. Lewis County,* 95 F.2d 236 (9th Cir.1938); *United States v. Nez Perce County,* 95 F.2d 232 (9th Cir.1938); *Board of Commissioners of Caddo County v. United States,* 87 F.2d 55 (10th Cir. 1936); *United States v. Board of Commissioners of Commanche County,* 6 F.Supp. 401 (W.D.Ok.1934). To the extent these cases and *Mahnomen* are inconsistent, *Mahnomen* of course controls; yet even these Ninth and Tenth Circuit cases recognize the possibility of post-issuance consent to the fee patent. While noting that the Indian involved had neither mortgaged nor sold any part of his patented land, the *Nez Perce County, supra,* court reversed the district court's denial of the government's recovery of the property taxes paid by the Indian, and remanded for a specific finding on the issue of consent. Similarly, the parties in *Caddo County, supra* assumed that "the voluntary acceptance of a fee patent during the trust period operates to end the immunity", 87 F.2d at 56. The

district court there, however, resolved the conflicting evidence to find there had been no consent. While recognizing that the fact that the allottee signed the receipt for the patent, her husband recorded the patent, and two mineral leases on the land were executed were "facts and circumstances which argue persuasively that the patent was accepted", 87 F.2d at 57, the court took the view that this was outweighed by the allottee's testimony that she did not want the patent, and that the taxes on the land were paid under protest.

Other case law also supports the proposition that actions by the Indian involved can manifest consent. *See, e.g., Mottaz v. United States,* 753 F.2d 71, 75 (8th Cir. 1985) (sale of fractional allotments on petition by some, but not all, owners: if non-petitioning owner "received payment for the land in 1955, then, on the facts of this case, we believe it may be assumed that she consented to the sale and thus that she does not have a cause of action."); *Taylor v. Hearne,* 637 F.2d 689, 691 (9th Cir.) *cert. den.,* 454 U.S. 851, 102 S.Ct. 291, 70 L.Ed.2d 141 (1981) ("He recorded his title to parcel 24 one day after the government transferred it to him. Furthermore, he transferred his interest in the parcel to the Marquets in 1974, behavior that is inconsistent with any intention to reject the distribution."); *United States v. Benewah County,* 290 F. 628 (9th Cir.1923); *Morrow v. United States,* 243 F. 854, 855 (8th Cir.1917) (the court stated the issue as whether land patented under the Clapp Amendment was "subject to state and local taxation, where the allottee has never attempted to avail himself of any power he might have under that amendment to alienate or incumber.")

█ It is clear, then, that "[c]onsent depends on the facts and circumstances appearing in evidence in the particular case ... While a mortgage or deed conveying a portion of the land does not in itself establish consent, it may constitute evidence that the patent had previously been accepted." *United States v. Frisbee,* 165 F.Supp. 883, 889 (D.Mont.1958). Indeed, sale or mortgage of even part of the patented allotment must be considered as strong evidence of consent to the patent. *United States v. Glacier County,* 74 F.Supp. 745, 748 (D.Mont.1947), explains it well, discussing an attempt by the United States to cancel the unsold portion of a fee patent:

> [the allottee] conveyed the land by warranty deed which she could not have done without accepting and consenting to the patent as an indispensable basis of her act for such conveyance. In other words, she warranted the title and said by her warranty that she had good title to the land and a legal right to convey it. . . .
>
> If she did not apply for the patent or consent to its issuance, how could she convey part of the land by warranty deed and consent to the patent to that extent and repudiate the patent as to the remainder of the land; the inconsistency is so great that the court will not attempt to solve it, and counsel for the Government have not done so, nor have they cited any authority in point to sustain their position. Mrs. Hall either consented to the issuance of the patent or she did not do so—the patent is an indivisible entity and can not be held good as to part of the tract of land conveyed and bad as to the remainder; it conveyed to Mrs. Hall her allotment in fee simple consisting of 320 acres.

*Frisbee, supra,* followed *Glacier County's* reasoning. *Frisbee* involved an action by the United States to recover 40 acres of a former allotment patented under the Burke Act which had been taken under a tax deed. The *Frisbee* court observed that the allottee had signed a receipt for the patent, recorded it a month later, and then executed mortgages for parts of the land other than the 40 acres later taken for taxes. Taxes were paid by someone on the 40 acres for one year. The allottee testified she did not want the patent, and had thought that she did not have to pay taxes on the land. The *Frisbee* court found the facts before it indistinguishable from those in *Glacier County,* and ruled that the allottee "must be held to have consented to the

issuance of the fee patent." *Frisbee, supra,* 165 F.Supp. at 891.

Plaintiff contends that *Frisbee* and *Glacier County* are inapplicable here, apparently because of the court's patronizing discussion in *Glacier County* at 74 F.Supp. 748 comparing the allottee's appearance and intelligence to that of an intelligent white person. Plaintiff points out, correctly, that no such evidence is present in this record, but this court finds this factor insufficient to defeat the principles followed in *Glacier County* and *Frisbee.* Competency does not seem to have been actually considered as a pertinent issue by the court in either case,[18] and in *Frisbee,* after an implied attack on the sophistication of the allottee, the court did no more than to state that the Indian involved "gave the impression of being of at least average intelligence." 165 F.Supp. at 890.

Further, while it cannot be denied that it would be useful to have more evidence of the circumstances under which the allotment at issue here left the possession of its allottee-owner, the court is not convinced by plaintiff's argument that defendants have failed to put forward sufficient evidence of consent. Plaintiff contends that a heavy burden of proof must be cast on defendants on this issue, citing cases on waiver of constitutional rights, including *Rau v. Cavenaugh,* 500 F.Supp. 204, 207 (D.S.D.1980). It is not entirely clear that this doctrine is applicable to this issue, particularly in light of the implication in *Mahnomen, supra,* that the burden is on the person seeking to establish the continued existence of trust status to show the invalidity of the fee patent. In any event, plaintiff has cited no authority why this case should not be governed by the normal operation of Federal Rule of Civil Procedure 56(e):

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon

the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

■ Here, defendants, as part of their motions for summary judgment, have shown that plaintiff's allottee parted with his land for a consideration under either a deed of sale or a mortgage. This has been recognized as particularly persuasive evidence of consent to the fee patent by Congress itself in the legislative history to the Cancellation Acts, and by numerous cases cited in this portion of this opinion. Under Rule 56(e), plaintiff was obligated to produce "specific facts" showing why there was still an issue for trial. Plaintiff did not do so; plaintiff has instead cited the court to incidents reported in the 1920's of Indians whose land was taxed in spite of *Choate,* and who either sold their land to avoid its being taken, or mortgaged it to pay the taxes. Also, the court has been shown instances in which allottees lost their land to unscrupulous merchants and speculators. Even an unquestioning acceptance of the truth of these reports, however, does nothing to show what actually happened in *this* case. All the court has before it is the conveyance of the land under a sale or mortgage by the allottee. In the absence of any other evidence, and given the legal precedent on the effect of a sale or mortgage, this court must conclude that the allottee here consented to the issuance of the fee patent. Plaintiff therefore has no claim under that allottee for the recovery of the land in question, and the court, were it to rest its decision on this ground, would have no hesitation in entering summary judgment for defendants for this reason as well.

18. This may well have been because, as this court noted in its discussion of *United States v. Debell, supra,* errors made in determinations of competency do not render void the issuance of fee patents under the Burke Act. In any event,

the allottee here was found, under legislative rules issued by the Secretary, *see* Part IV, *supra,* to be competent, just as the allottee in *Mahnomen* was legislatively found competent.

**658**

## CONCLUSION

Before leaving this dispute, the court must join in the sentiments of the Western Division of this court in *Nichols v. Rysavy,* 610 F.Supp. 1245 at 1254 (D.S.D.1985): "the forced fee patent claims cry out for a legislative solution." [19] While this court has found there to be no judicial merit to plaintiff's claims, the claims may well represent a "moral" debt owed by the United States to the estates of Indian allottees injured by the forced fee patent policy described in this opinion.

Whether claims such as this shall become eligible for monetary compensation from public funds must depend upon whether Congress sees fit to establish an appropriate forum in which redress may be obtained. For the reasons given in this opinion, however, plaintiff's claims in this court in this action must be and are denied.

---

**19.** *Nichols* dismissed claims identical to those presented here, although on different grounds. This court also bases its decision today on the reasoning of *Nichols* as an additional basis for its holding.